# **Exhibit 1:**
## Independent Contractor Operating Agreement



## J.B. Hunt Transport, Inc.

### INDEPENDENT CONTRACTOR OPERATING AGREEMENT

---

**Important Information Regarding Arbitration**

Section 38 of this Agreement requires you to arbitrate any claim you may have against us (with a few exceptions), unless you choose to opt out. It also prohibits you from bringing any class, collective, consolidated, or non-Private Attorney General Act representative action against us, and from participating in or recovering relief under any current or future class, collective, consolidated, or non-Private Attorney General Act representative action brought against us by someone else. The agreement to arbitrate is optional and is not a condition of your business relationship with us. You should carefully consider the consequences of your decision not to opt out, just as you would when making any other important business decision. As noted, you have a right to unilaterally opt out of the agreement to arbitrate in Section 38 within 30 days of signing it (*see* Section 38(e)).

---

This Independent Contractor Operating Agreement ("Agreement") is made between the undersigned contractor ("Contractor") and J.B. HUNT TRANSPORT, INC., ("Carrier"). In consideration of the mutual promises made in this Agreement and pursuant to 49 C.F.R. Part 376, Contractor and Carrier agree as follows:

### PREAMBLE

J.B. HUNT TRANSPORT, INC. is a motor carrier authorized to transport freight in interstate and intrastate commerce. Contractor is the owner of motor vehicle equipment which Contractor desires to lease to Carrier with qualified driver(s). The parties acknowledge this Agreement must follow certain regulations of the United States Department of Transportation ("USDOT") including but not limited to safety and leasing regulations. Contractor agrees to provide the motor vehicle identified below and a driver for that motor vehicle. The driver and the motor vehicle will be in compliance with all USDOT requirements. Carrier will compensate Contractor in accordance with the terms of this Agreement.

### AGREEMENT

1.       [Reserved]

2.       <u>Identification of Equipment to be Leased:</u> Contractor leases to Carrier the motor vehicle or vehicles described in the Receipt for Equipment and Certificate of Authorized Operation attached hereto as Appendix D ("Receipt").

3.       <u>Receipt of Equipment:</u> The equipment Contractor will lease to Carrier pursuant to the terms and conditions of this Agreement is identified in the attached Receipt (the "Equipment"), which, when executed, will show the date and time of the receipt of the Equipment by Carrier, which shall constitute the receipt as required by 49 C.F.R. § 376.11(b). Carrier will use the capacity provided by Contractor in connection with Carrier's for-hire transportation operations. Contractor represents and warrants that Contractor is the Equipment's "owner" under 49 C.F.R. § 376.2(d). Contractor is free to substitute a different vehicle for the one constituting the Equipment if each of the specifications applicable to Equipment is met with respect to such different vehicle and Carrier furnishes Contractor with a new receipt covering the vehicle. Carrier

does not guarantee any specific number of shipments or amount of revenue or profit to Contractor, or to use the Equipment at any particular time or location. Contractor is free to provide vehicles not identified as Equipment and professional truck driving services to other motor carriers during the term of this Agreement. Upon termination of this Agreement, or when possession by Carrier of the Equipment ends, Contractor shall give Carrier or its authorized representative a receipt evidencing the date and time of the return of the Equipment to Contractor's control. **Throughout this Agreement, "Contractor's workers" and "Contractor's drivers" include Contractor if Contractor elects to personally perform any aspect of this Agreement.**

4.      Exclusive Use: Carrier will have exclusive possession, control, and use of the Equipment, and will assume complete responsibility for the operation of the Equipment for the duration of this Agreement. The foregoing declarations are made solely to conform to FMCSA regulations and may not be used for any other purposes, including any attempt to classify Contractor as an employee of Carrier. Nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether any of Contractor's workers is an independent contractor or an employee of Carrier. Solely because of the limitations of 49 C.F.R. §§ 376.12(c)(1) and (2), Contractor may operate the Equipment for another motor carrier or entity during this Agreement only with Carrier's prior written consent.

5.      Settlement:

a)      In General. Contractor's invoice settlement amount is specified in Appendix A to this Agreement and constitutes the total settlement for the use of the Equipment and everything furnished, done by, or required of Contractor's workers in connection with this Agreement, including (but not limited to) driving the Equipment and performing all non-driving activities, such as installation, pre- and post-trip inspections, waiting to load or unload (detention), loading or unloading (if required), fueling, repairing and maintaining the Equipment, hooking and unhooking trailers (loaded or empty), preparing logbooks and other paperwork, and other services. **Contractor— as an independent contractor, not an employee—agrees that Contractor is responsible for paying all operating expenses.** Contractor is entitled to gross settlement only upon the full performance of any load offered by Carrier and accepted by Contractor. In the event Contractor provides services under this Agreement (1) for a separate Carrier business unit than contemplated under the initial Appendix A executed by Contractor, or (2) under a different settlement method (e.g. percent of revenue; special project) than contemplated under the initial Appendix A executed by Contractor, then Contractor will execute a new Appendix A that will govern only the services contemplated under the new Appendix A.

b)      Mileage-Based Invoice Settlement. Carrier will not be required to pay mileage for transportation by Contractor's driver while not under dispatch by Carrier. The dispatched mileage will be determined from each point of origin to each point of destination as determined by the mileage guide published by Rand McNally Mileage Guide. With respect to Carrier's computerized mileage guide, Carrier will furnish to Contractor without charge during normal business hours print-outs of any mileage calculations reasonably requested by Contractor.

c)      Changes in Invoice Settlement. Carrier will provide Contractor with a proposed amendment or updated appendix containing any change to Contractor's gross settlement at least 30 days in advance with the exception of the fuel surcharge payment which will vary at the discretion of Carrier. If Contractor wishes to continue operating on Carrier's behalf, Contractor may consent to the change by signing the amendment or updated appendix. If Contractor does not consent to the change before the date indicated on the amendment or updated appendix, this Agreement may be terminated on the date set forth on the amendment or updated appendix, and Contractor will not be subject to the change proposed in the amendment or updated appendix. Notwithstanding the foregoing, Contractor may consent in writing to the change becoming effective prior to the date indicated on the amendment or update appendix.

d)      Adjustments to Invoice Settlement for Billing Errors (Applicable Only to Settlement Based on Percentage). If Carrier discovers and corrects an error in the amount of any item billed on a shipment that Contractor hauled and for which Contractor was compensated on a percentage basis, Carrier will credit to, or deduct from, Contractor's gross settlement at a subsequent settlement a share—corresponding to the applicable percentage normally payable to Contractor for that service—of the amount Carrier actually collects or refunds in remedying the error.  Upon Contractor's request, Carrier will provide Contractor with a copy of the amended rated freight bill or a computer-generated document that contains the same information (or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill), and will otherwise meet the requirements of Section 6 of this Agreement with respect to the shipment.

6.      Settlement Period and Documentation:

a)      Settlement. Carrier will settle with and pay Contractor within fifteen (15) days after Contractor's submission of the necessary delivery documents, properly completed logbooks (including ELD as defined in Section 21(a)) required by the USDOT, and those documents necessary for Carrier to secure payment from the shipper, which are the bill of lading, signed delivery receipt or other proof of delivery acceptable to Carrier, concerning a trip in the service of Carrier under this Agreement. In order to ensure compliance with the federal regulation requiring Carrier to pay Contractor within 15 days after submitting such documents, when invoice settlement is based on a percentage of Linehaul Load Revenue, Carrier shall initially pay Contractor based on revenue *billed* to Carrier's Customer. However, Contractor remains entitled only to Linehaul Load Revenue based on revenue actually *collected* by Carrier from Carrier's Customer; as such, the initial amount Carrier pays to Contractor in order to satisfy the federal regulation remains subject to correction beyond the 15-day period as described and authorized in Section 5(d). At each settlement, Carrier will furnish to Contractor a statement detailing all debit and credit entries since the preceding statement ("Settlement Statement"). The parties agree that all debit and credit entries detailed in each Settlement Statement are conclusively presumed to be correct and proper if not disputed by Contractor within 180 days of Carrier's issuance of the Settlement Statement.

b)      C.O.D. Settlement shall not be contingent upon submission of a bill of lading to which no exceptions have been taken. In the case of a C.O.D. shipment only, Contractor, as trustee, will collect and account for all monies due Carrier for transportation charges and cost of goods in shipments designated as Cash on Delivery ("C.O.D."), in accordance with the bill of lading, shipping contract, or other instructions and must promptly deliver the certified check or money order due Carrier and any other documents necessary for Carrier to secure payment from the shipper. Carrier shall provide Contractor with notice at the time of dispatch that the particular shipment is a C.O.D. delivery, specifying which documents are required to be delivered to Carrier. Contractor is not authorized to make any adjustments to the amount to be collected, and agrees that no shipment will be delivered until all C.O.D. charges have been collected as required. Any losses relating to the return and transmittal of monies so collected or not collected will be solely Contractor's responsibility, and Contractor authorizes Carrier to deduct or otherwise recover all such amounts.

c)      Freight Documentation. Where Contractor is compensated based on a percentage of revenue, Carrier will provide Contractor with a copy of the rated freight bill or a computer-generated document that contains the same information—or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill—before or at the time of settlement. Regardless of the method of settlement, Contractor may examine Carrier's tariffs (or other contracts or documents, if any) from which rates and charges are computed, as well as documents underlying any computer-generated document, at Carrier's headquarters during business hours. If rates and charges are computed from a contract, Contractor may examine only those portions of the contract containing the same information as would appear on a rated freight bill. Carrier may delete the names of shippers and consignees shown on that documentation. Nothing

in this Agreement limits Carrier's exclusive right to set the rates and amounts charged to Carrier's customer. **All documents examined by Contractor under this section are designated Confidential Matters under Section 23 of this Agreement.**

    d)    <u>Removal of Identification</u>. On termination of this Agreement, Carrier may withhold any settlement owed to Contractor until Contractor removes and returns to Carrier all Carrier identification devices or a letter certifying their removal.

7.    <u>Term and Termination:</u> The term of this Agreement commences on the Effective Date and ends 24 months thereafter. Either party may terminate this Agreement upon 30 days' written notice to the other party. The effective date of termination will be the earliest of the following: (i) as stated in the written notice; (ii) as stated on the receipt for the Equipment, if one is issued by Contractor to Carrier; or (iii) when Carrier's possession of the Equipment under 49 C.F.R. § 376.11(b)(2) ends. If Carrier or any of Contractor's workers does any of the following, the other party may elect to terminate this Agreement: (1) commits—or attempts, conspires, or threatens to commit—a felony or intentional tort; (2) violates any applicable federal, state, local, Native American tribal, or foreign law, regulation, or ordinance ("Applicable Law"); or (3) materially breaches this Agreement.

8.    <u>Alternative Uses of Equipment:</u> Except as restricted by Applicable Law, nothing in this Agreement prohibits Contractor from providing transportation services for other motor carriers, brokers, directly for shippers, or any other person or entity, provided that Contractor complies with the requirements of 49 C.F.R. Part 376. For this purpose, Carrier has prepared an Addendum for Alternative Uses of Equipment, which is available upon request. If Contractor engages in an Alternative Use of Equipment (as defined in the Addendum for Alternative Uses of Equipment) without obtaining the required authorization from Carrier in advance, Contractor will have materially breached this Agreement. In that event, and in light of the administrative, claims-investigation, litigation-related, and other expenses Carrier may incur in the event of a highway accident occurring due such an unauthorized trip, Contractor agrees to pay Carrier liquidated damages in the amount stated in the Addendum for Alternative Uses of Equipment, in addition to the indemnity obligation Contractor agrees to owe Carrier under this Agreement. In addition, Carrier may, at its option, immediately terminate this Agreement on account of such breach.

9.    <u>Contractor Independence/Control of Operations</u>.

    a)    <u>Taxes</u>. Contractor is free to choose the form in which to operate Contractor's business. Contractor shall remain solely responsible for payment of all federal and state taxes accruing as a result of its maintenance and use of the Equipment and retention and payment of workers to perform services under this Agreement. Contractor agrees to file all tax forms and returns that Contractor may be required by law to file, on account of Contractor's workers used in the performance of this Agreement, and to pay when due all taxes and contributions reported in the forms and returns. In that regard, Contractor knows: (i) of Contractor's responsibilities to pay estimated social security taxes and state and federal income taxes with respect to remuneration received from Carrier; (ii) that the social security tax Contractor must pay is higher than the social security tax the individual would pay if he or she were an employee; and (iii) that the service provided by Contractor to Carrier under this Agreement is not work covered by the unemployment compensation laws of any State, including Georgia; provided, however, that should Contractor employ or use drivers, helpers, or other workers to fulfill Contractor's obligations under this Agreement, and the drivers, helpers, or other workers are covered by the unemployment laws of any State, including Georgia, Contractor is solely responsible for providing unemployment insurance for the drivers, helpers, or other workers. Contractor agrees to furnish Carrier such evidence of compliance with the foregoing as Carrier may reasonably require, including but not limited to proof of income and payroll taxes currently paid by Contractor or withheld by Contractor from the wages of Contractor's workers. Carrier will file a Form 1099 with the Internal Revenue Service with respect to Contractor as required by Applicable Law.

b)   <u>Equipment, Maintenance, and Routes</u>. To the extent consistent with Applicable Law, Contractor is solely responsible for: (1) setting the method and time of performance for all delivery of loads accepted by it; (2) selecting, purchasing or leasing, and financing the Equipment; (3) selecting all routes and deciding all meal, rest, and refueling stops, provided that to meet Carrier's customers' demands, Contractor agrees to make timely and safe deliveries of all loads, and to notify Carrier when delivery has been made or will be delayed for any reason.

c)   <u>Customer Specifications</u>. The parties agree that in the performance of this Agreement, Carrier in its sole discretion will tender Contractor individual loads, subject to its Equipment availability on a load-by-load basis. Contractor agrees that any load may have customer-imposed service specifications which will be conveyed to the Contractor prior to or at time of tender. Contractor agrees to accept or reject the load tender and is not subject to forced dispatch. When carrying out any task related to this Agreement, including accepting any load, Contractor agrees to perform in accordance with any specifications that may be safely complied with without violating Applicable Law or Carrier's Policies or Procedures, and without endangering the public, Contractor's workers, or the property being transported. If Carrier's customer conditions access to its facilities or freight upon compliance with any customer specification that Contractor does not assent to, Contractor may categorically opt out of receiving Carrier's offer of shipments from such customer.

d)   <u>Independent Contractor Status</u>. This Agreement is between two independent parties that are separately owned and operated. It is the intent of the parties for Contractor to retain the status of an independent contractor for the Equipment and driver services provided under this Agreement. Contractor agrees to provide necessary documentation and apply for certification of Contractor's independent contractor status where mandated by Applicable Law. Contractor shall at all times be free to set its hours of operations consistent with the federally imposed hours of service requirements and the scope of the work accepted and the customer's service expectations. Contractor is free to work when and where it chooses and shall accept or reject work assignments on a load by load basis. Contractor agrees to comply with any scope of work requirement imposed by the customer service conditions when accepting a job assignment but is otherwise free to schedule the order of its work. Where Carrier's customer requires same and to facilitate efficient dispatch, Contractor agrees to provide electronic notification of its operating status including when Equipment is loaded, unloaded or otherwise available to dispatch.

e)   <u>Contractor's Workers</u>. Subject only to Applicable Law and safety considerations (including Carrier's policies and procedures), Contractor assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, supervising setting of hours, meal and rest breaks, wages, and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, coverage of worker injuries, adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of or relating to Contractor's use or employment of drivers, drivers' helpers, and other workers to perform any aspect of this Agreement. In addition, Contractor agrees to be solely responsible for complying with Applicable Law governing the terms and conditions of employment of Contractor's employees or applicants for employment, including, without limitation, compliance with the Federal Fair Credit Reporting Act; verification of immigration and naturalization status; proof of proper taxpayer identification number; proof of payment of income; unemployment; Medicare and other state and federal payroll taxes; and other required withholdings for Contractor's employees.

10.   <u>Contractor's Drivers:</u> Contractor is not obligated to personally perform any of the services contemplated by this Agreement. Contractor will provide professional workers who meet Carrier's qualification standards and Applicable Law, including all standards found in the Federal Motor Carrier Safety Regulations, which require among other things the driver to have a validly issued Commercial Driver's License, medical certification card and any other documentation required by the USDOT. Contractor's drivers must authorize Carrier to develop a driver qualification file (including performing

background checks) in accordance with FMCSA regulations, and access FMCSA's Safety Measurement System ("SMS") data, obtain motor vehicle records, access FMCSA's Pre-Employment Screening Program ("PSP") reports and Contractor and/or Contractor's drivers will register with the FMCSA's Drug and Alcohol Clearing House and will authorize Carrier to access any related records or reports, both during the driver-qualification process and at any time thereafter. Contractor appoints all drivers it furnishes to Carrier as Authorized Representatives of Contractor. Contractor acknowledges its driver must pass all applicable USDOT tests and/or requirements. Contractor and Contractor's drivers will submit to drug and alcohol tests pursuant to Carrier's Drug-and-Alcohol Policy, and agrees to submit to and bear the costs of such testing. Carrier will disqualify, for at least the period specified in 49 C.F.R. § 383.51, any driver who has been convicted of or alleged to have committed a disqualifying violation set forth in that regulation, and Carrier will have the right to disqualify temporarily or permanently any driver (including Contractor) found to be: (i) in violation of Sections 10, 12(a), or 21(b) of this Agreement; (ii) unsafe, unqualified, unfit, or uninsurable under Applicable Law; (iii) in violation of applicable driver qualification standards; or (iv) in violation of any customer specifications. Upon a driver's disqualification, Contractor shall have the right to substitute other qualified drivers to perform the services, subject to Carrier's confirmation that Contractor's driver meets the driver qualifications established by Applicable Law and Carrier's driver qualification standards. Contractor warrants that no driver will be used until the driver has been qualified by Carrier. Notwithstanding anything to the contrary herein, Carrier may request that certain drivers not provide services under this Agreement. Upon reasonable prior notice by Carrier to Contractor, Contractor will no longer utilize any such drivers to provide services under this Agreement.

11.    The Parties Duties Upon Reclassification.  If any of Contractor's workers is determined to be an employee of Carrier by any governmental authority, whether directly or as a joint employer ("Reclassification Decision"), either party may, at its election, rescind this Agreement back to the time of its formation, and both parties would then be returned to their respective positions before it was signed. If either party makes that election, the following terms apply when the Reclassification Decision becomes final:

a)    Contractor's Obligations. Contractor will: (i) owe Carrier, for the period of time this Agreement was in effect, all gross invoice settlement (as defined in Section 5 of this Agreement) previously paid to Contractor by Carrier, less any deductions under Section 22 of this Agreement; (ii) relinquish all rights in any balances in escrow funds then under Carrier administration that are traceable to invoice settlement previously paid to Contractor by Carrier; and (iii) owe Carrier any cash advances provided by Carrier to Contractor that Contractor used for personal, household, or other expenses not in performance of Contractor's obligations under this Agreement or that Contractor retained unspent. Contractor will be entitled to deduct from these amounts any expenses Contractor incurred in performance of Contractor's obligations under this Agreement that were not covered by charge-backs or paid by Carrier.

b)    Carrier's Obligations. Carrier will immediately owe Contractor, for all work activities during the period of time this Agreement was in effect (including any activities for which Carrier has not yet paid Contractor), only the then-applicable "mean hourly wage" for Occupation Code 53-3032 and/or 53-3033, as applicable based on Contractor's Equipment, for Arkansas, as published by the Bureau of Labor Statistics of the U.S. Department of Labor (or, if higher, the federal minimum hourly wage or a state's then-applicable minimum hourly wage but only to the extent Contractor's wage-earning activities occurred in that state), multiplied by Contractor's total hours spent actually performing on-duty work for Carrier, consisting of both driving and non-driving time, under any applicable hours-of-service regulations. The total hours worked will be computed based on any relevant, reliable evidence, which may include Settlement Statements, driver logs, shipment-tracking data, bills of lading, fuel receipts, and toll receipts.

c)    Option to Terminate. Because reclassification of Contractor or any of its workers as an employee of Carrier would fundamentally change the parties' assumptions and expectations, either party may, upon issuance of a Reclassification Decision, terminate this Agreement on 1 day's notice to the other.

d)    <u>Survival</u>. The provisions of this section will survive both the rescission and termination of this Agreement.

12.    <u>Legal Requirements and Customer Specifications</u>: Contractor's workers who perform services under this Agreement will not engage in—or attempt, conspire, or threaten to engage in—any act or omission that would constitute a felony or intentional tort, whether or not arising out of or relating to operations under this Agreement. In addition, Contractor recognizes that Carrier's separate and distinct business of providing motor carrier freight transportation service to the public is subject to customer specifications and to regulation by various federal state, local, Native American tribal, and foreign authorities. Contractor acknowledges that Contractor has a full and complete understanding and knowledge of the requirements of all these authorities and of all applicable customer specifications. Contractor agrees to adhere to and perform the following to aid Carrier in discharging Carrier's legal and customer-service responsibilities.

a)    <u>Safe and Legal Operations</u>. Contractor agrees to ensure that all of Contractor's workers: (i) drive or otherwise perform in a safe and prudent manner at all times so as to avoid endangering the public, the worker, and/or the property being transported; (ii) comply with Applicable Law (including without limitation prohibitions on texting and use of handheld mobile telephones), Carrier's operating authorities, and all customer specifications and Carrier Policies and Procedures (to the extent compliance would not pose an undue safety risk); and (iii) not be involved, during this Agreement, in an "accident" that, in Carrier's reasonable judgment, was "preventable," as those terms are defined in 49 C.F.R. § 390.5 and 49 C.F.R. Part 385, App. B, respectively.

b)    <u>Compliance, Safety, and Accountability</u>. Contractor's drivers must at all times meet FMCSA's safety standards sufficient to enable Carrier to: (i) achieve and maintain a "satisfactory" or similar rating that enables Carrier to operate without FMCSA intervention or restriction pertaining to any of the safety evaluation areas ("BASICs") measured by FMCSA's Compliance, Safety, Accountability program ("CSA"); (ii) obtain insurance coverage without increased costs associated with driver ratings or other driver measurements under CSA; and (iii) be and remain competitive with similarly situated carriers with regard to quality of driver safety as measured under CSA. Contractor must notify Carrier in writing within 1 business day of receiving notification from FMCSA that any of Contractor's drivers have been deemed "unfit" or otherwise disqualified from operating commercial motor vehicles in interstate commerce.

c)    <u>Services and Completion of Performance</u>. Contractor agrees, for each shipment and service request Contractor accepts pursuant to this Agreement, to transport the freight tendered to it by Carrier from point of origin to point of destination in a reasonable and timely manner. If Contractor does not or cannot complete the load, or Contractor's acts or omissions related to a shipment—including but not limited to the failure to complete delivery or abandonment of freight or trailing equipment—subject Carrier to liability, Carrier may take possession of the shipment and complete performance. In that event, Contractor waives any recourse against Carrier for the action. Contractor authorizes Carrier to deduct or otherwise recover from gross invoice settlement all direct or indirect costs, expenses, or damages, including attorneys' fees, incurred by Carrier as a result of Carrier's taking possession of the shipment and completing performance. Nothing contained herein shall require Contractor's driver to violate the safe transportation of the Equipment or the hours-of-service rules of the USDOT, and Contractor's driver may refuse to transport the freight tendered to it by Carrier if Contractor believes that the transportation would result in such violation.

d)    <u>Transportation Worker Identification Credential</u>. Contractor agrees to ensure that each of Contractor's workers obtains a Transportation Worker Identification Credential ("TWIC") if a TWIC is necessary to access any locations. If any of Contractor's workers lack a TWIC and need a suitably-credentialed escort, Contractor agrees to pay the fee charged by the escort.

e)    <u>Documents</u>. Contractor must timely submit to Carrier all properly completed driver logs and supporting documents (including originals or copies of toll receipts), physical-examination certificates, accident reports, and any other required data, documents, or reports. Contractor agrees that all bills of lading or other papers identifying the property carried on the Equipment will show that the property is under the responsibility of Carrier or of a Sublease Carrier (as defined in the Addendum for Alternative Uses of Equipment).

f)    <u>Acceptance of Loads</u>. Contractor is free to accept or reject any shipment tendered to it by Carrier. When Contractor accepts a shipment tendered to it for transportation, Contractor agrees to perform its services hereunder in such a manner as to satisfy Carrier's customers' specifications including, but not limited to, complying with pick-up and/or delivery dates and times specified by Carrier's customers and by complying with Applicable Law and Carrier's Policies and Procedures. The failure of the Contractor to fulfill this obligation will constitute a material breach of this Agreement.

g)    <u>Medical Examinations</u>: Contractor agrees to ensure that all of Contractor's drivers complete medical examinations prior to driving and follow-up examinations as required by 49 C.F.R. §§ 391.41 *et seq.* Contractor will bear the expense of medical examinations for all of Contractor's drivers. Contractor also agrees to ensure that each driver notifies Carrier immediately if a physical condition develops or worsens, or, the driver begins taking (or increases the dosage of) a medication that might adversely affect the driver's ability to safely operate a commercial motor vehicle. Carrier may, any time after learning of a driver's adverse physical condition or new medication or dosage, suspend the driver's qualification to operate the Equipment under Carrier's authority pending Carrier's receipt of further information from Contractor. Carrier will then decide whether to restore the qualification of the driver and will notify the driver and Contractor of the decision.

h)    <u>Carrier's Policies and Procedures</u>. To aid Carrier in discharging Carrier's obligations under Applicable Law and meeting customer specifications, Carrier has adopted Policies and Procedures comprised of applicable Driver Qualification Standards, a Drug and Alcohol Policy, customer specifications, and a Motor Carrier Resource Guide. Carrier may amend the aforementioned policies, standards, specifications, and guides at any time and will furnish any amendments to Contractor before the amendment goes into effect.

13.    <u>Contractor's Operating Expenses</u>.

a)    <u>Equipment Warranties</u>. The Equipment is in good condition and fully complies with all Applicable Law. Contractor will maintain the Equipment in safe condition and in compliance with Applicable Law (including, without limitation, compliance with applicable California Air Resources Board regulations), at Contractor's expense, during the term of this Agreement. To ensure compliance with Applicable Law, Contractor must either: (i) provide Carrier a copy of an inspection report showing the Equipment passed a full annual inspection under 49 C.F.R. § 396.17 within the 60-day period prior to the Effective Date; or (ii) make the Equipment available for an inspection at an approved maintenance facility, and have any necessary maintenance or repairs done at Contractor's expense, before the Effective Date. Federal Motor Carrier Safety Regulations found at 49 C.F.R. Part 396, or any successor regulations, specify that all motor vehicles subject to an independent contractor operating agreement be subjected to systematic inspections and repairs. Contractor hereby agrees that, during this Agreement, Contractor shall cause the Equipment to be inspected every 180 days (except as otherwise provided by applicable law), at Contractor's expense, at such facilities as Carrier shall have approved (such approval not to be unreasonably withheld) and to effect needed repairs at Contractor's sole cost and expense. Contractor also agrees to have a full inspection performed at an approved maintenance facility within two (2) days following any roadside inspection of the Equipment that results in a violation with negative implications for Carrier's Vehicle Maintenance BASIC, at Contractor's expense. Contractor also agrees to make the Equipment available for inspection at any time upon

reasonable request by Carrier at an approved maintenance facility, at Contractor's expense. Contractor agrees to provide Carrier with a copy of any inspection reports (roadside or otherwise) immediately upon completion of the inspection and agrees to share with Carrier records of inspections, repairs and maintenance for the Equipment upon Carrier's reasonable request.

b) <u>Expenses</u>. Contractor, at Contractor's expense, agrees to provide the Equipment ready to operate and fully roadworthy, including the necessary licenses, permits, cab cards, and state base plates, and will furnish all lubricants, fuel, oil, tires (including changing or repairing tires) and other parts, supplies, equipment, accessories, or devices used in connection with the operation of the Equipment. Unless otherwise provided in this Agreement, Contractor agrees to pay all expenses incident to the operation of the Equipment, including but not limited to maintenance costs including repairs, empty mileage, lumper services, fuel use taxes, highway use taxes, weight taxes, state property, ad valorem, or indefinite situs taxes, registration fees, base plates and licenses (and any unused portions thereof), Native American tribal fees and other permits of all types, ferry, bridge, tunnel and road tolls, detention and accessorial charges not collected by Carrier because of Contractor's failure to provide required documentation, and the costs of Contractor's workers as set forth in Section 9 of this Agreement.

c) <u>Fines and Penalties</u>. Except as otherwise provided in Section 13(d) and **not subject to the indemnity limits of Section 20(b) of this Agreement**, Contractor agrees to promptly notify Carrier of and pay all fines and penalties arising out of or relating to the use of the Equipment under this Agreement—whether naming all of Contractor's workers who perform services under this Agreement, Carrier, or both, and including but not limited to parking, traffic, or logbook-violation fines and penalties—imposed for the violation of Applicable Law where the violation results, at least partially, from the acts or omissions of any of Contractor's workers. Contractor authorizes Carrier to deduct or otherwise recover all such amounts.

d) <u>Overweight and Oversized Shipments</u>. Contractor agrees to ensure that all shipments are in compliance with the size-and-weight laws of the States, provinces, and localities through which the Equipment will travel, and to notify Carrier if the vehicle is overweight, oversized, or in need of permits before commencing the haul. Except when the violation results from the acts or omissions of Contractor, Carrier will assume the risks and costs of fines for overweight and oversize trailers when the trailers are preloaded and sealed, or the load is containerized, or for improperly permitted loads, or the trailer or lading is otherwise outside of Contractor's (including Contractor's drivers') control. Contractor agrees to pay or reimburse Carrier for any costs or penalties due to Contractor's failure to weigh each shipment or to notify Carrier that the vehicle is overweight, oversized or in need of permits. Contractor authorizes Carrier to deduct or otherwise recover all such amounts.

e) <u>Base Plates</u>. Contractor agrees to obtain and display on the Equipment the base plates necessary to operate the Equipment lawfully on Carrier's behalf. If Carrier offers to facilitate base plates on Contractor's behalf, and if Contractor chooses to have Carrier obtain the base plates and deduct the expense from Contractor's gross invoice settlement, Contractor will so indicate in Appendix B. If this Agreement is terminated prior to Contractor's reimbursement of Carrier's expense in full, Contractor authorizes Carrier to deduct any remaining amount from Contractor's final settlement and/or escrow fund and to return the base plate(s) to Carrier. To the extent Carrier receives a refund or credit upon returning a base plate, Carrier will retain such credit or refund. If Contractor asks Carrier to make any changes to a base plate (for example, to increase or decrease the vehicle-weight bracket), Carrier will use its best efforts to make the change and deduct or otherwise recover the amount stated in the Deductions Table in Appendix B ("Deductions Table").

f) <u>Permits</u>. Contractor agrees to obtain and pay for all permits and licenses necessary under Applicable Law for Contractor to operate the Equipment lawfully on Carrier's behalf. In jurisdictions where Contractor is

DocuSign Envelope ID: 61133899-A2C8-4584-9353-CE59C72C3DE9

responsible for obtaining permits to operate lawfully in their territories, Contractor may either obtain and pay for all such permits on Contractor's own or elect to have Carrier obtain such permits for the amount stated in the Deductions Table provided in Appendix B, which amount Carrier will deduct or otherwise recover from Contractor. In jurisdictions where only Carrier (not Contractor) is eligible to apply for certain permits—such as the Oregon Weight-Mile Tax, New York Highway Use Tax, Unified Carrier Registration (UCR) permits to haul hazardous materials in or through the States of California, Colorado, Idaho, Nevada, or West Virginia, or to haul intrastate on Carrier's behalf in those States that impose initial per-vehicle filing fees for intrastate permits—Carrier will obtain the permits and deduct or otherwise recover the amount stated in the Deductions Table. If Contractor asks Carrier to obtain a special permit required by Applicable Law for Contractor to haul a particular shipment or shipments (e.g., an overdimensional permit or a temporary permit), Carrier will obtain the permit(s) and deduct or otherwise recover the amount stated in the Deductions Table. Contractor agrees to return all permits issued in Carrier's name to Carrier upon termination of this Agreement. No refund will be made to Contractor by Carrier of the permit expenses, even if returned permits are reused by Carrier. Contractor will be liable to Carrier for all expenses incurred by Carrier due to Contractor's failure to return any permits. If Contractor asks Carrier to make any changes to a permit (e.g., to increase or decrease the vehicle-weight bracket), Carrier will use its best efforts to make the change and deduct or otherwise recover the amount stated in the Deductions Table. Contractor may, upon request, obtain an itemization of the amounts Carrier has advanced for Contractor for permits, the portion of that amount already paid by Contractor, and the portion remaining. This itemization will separately identify each amount paid to the issuing jurisdiction, plus Carrier's administrative fee (if any), and any fees to a third-party service.

g)      Fuel and Mileage Taxes Reporting. Contractor is responsible for obtaining an International Fuel Tax Agreement ("IFTA") permit and performing fuel and mileage tax reporting for the operation of the Equipment. If Contractor elects to do so on Contractor's own, Contractor agrees to be solely responsible for calculating, reporting, and paying all fuel taxes owed for the operation of the Equipment, **and agrees to indemnify, defend, and hold harmless Carrier from all claims arising out of or relating to the fuel tax reporting and payment (not subject to the indemnity limits in Section 20(b) of this Agreement)**. If Contractor instead elects to have Carrier perform fuel and mileage reporting on Contractor's behalf:

i)      Carrier Fuel Resources. Carrier will be deemed the reporting entity with respect to the Equipment and the fuel consumed by it. Carrier will submit on a monthly or quarterly basis as required by state taxing jurisdictions, in Carrier's name, all applicable reports and payment of fuel and mileage taxes. Carrier may in its sole discretion furnish Contractor with a card ("Advance Card") and/or allow Contractor access to Carrier's fuel network that Contractor's workers may use only for fuel, additives, lubricants. Contractor's workers are free not to use the Advance Card or Carrier's fuel network, but in the event Contractor's workers fuel outside Carrier's network, Contractor agrees to promptly provide Carrier with original fuel receipts (to include the date of the receipt of fuel, the name and address of the person from whom purchased, the number of gallons received, the type of fuel, and the vehicle equipment number into which fuel was placed).

ii)     Fuel Tax Deductions or Credits. In addition to the flat periodic charge set forth in Appendix B, Carrier will quarterly, with respect to Contractor's operations in all taxing jurisdictions combined, either: (i) deduct or otherwise recover any net fuel use tax owed; or (ii) credit Contractor for any net fuel use tax credit or refund due Contractor. Carrier will ensure that Contractor receives quarterly summaries of credits and debits for fuel taxes on a state-by-state basis either on Settlement Statements or through separate accountings, at Carrier's option.

DocuSign Envelope ID: 61133899-A3C3-4584-9353-CE59C72C3DE9

iii)    <u>Computation of Taxes</u>. Carrier will compute Contractor's fuel use and mileage taxes utilizing Contractor's miles, fuel and MPG. If Contractor fails to provide Carrier complete and accurate fuel-tax-related records in time for Carrier's computation of Carrier's fuel tax reports and payments for the preceding quarter, Carrier will compute Contractor's fuel use taxes based on total miles dispatched by Carrier at the miles-per-gallon rate stated in the Deductions Table.

14.    <u>Insurance</u>:

a)    <u>Carrier's Insurance Obligation</u>. Under FMCSA regulations (49 C.F.R. Part 387) issued pursuant to 49 U.S.C. § 13906, Carrier will maintain (through the purchase of insurance policies or an FMCSA-approved self-insurance program) "public liability" insurance (as defined in 49 C.F.R. § 387.5) at all times the Equipment is being operated on behalf of Carrier. Carrier may also maintain cargo loss-and-damage insurance at all times the Equipment is being operated on behalf of Carrier. These coverages will be maintained at Carrier's expense. Carrier's possession of public liability and/or cargo loss-and-damage insurance will in no way affect Contractor's indemnity obligations to Carrier as provided for in this Agreement. Carrier's public liability insurance and cargo insurance do not list Contractor, either by class or individually, as an additional insured. If Contractor wishes to insure Contractor against bodily-injury, property-damage, environmental-restoration, and cargo claims asserted directly against Contractor by an injured third party, Contractor must purchase and maintain Contractor's own insurance policies covering such claims.

b)    <u>Contractor's Insurance Obligations</u>.

i)    <u>Non-Trucking Liability</u>.  Contractor agrees to maintain non-trucking liability insurance providing public-liability coverage to Contractor whenever the Equipment (including any Carrier-provided trailing equipment) is not being operated on behalf of or in the business of Carrier. The coverage must have limits of no less than $1,000,000 per occurrence and be no less comprehensive than the non-trucking liability insurance Carrier may facilitate on Contractor's behalf if Contractor so chooses. Contractor will be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

ii)    <u>Work-Injury Coverage</u>. During the term of this Agreement, Contractor shall, at Contractor's expense, carry and maintain in full force and effect an insurance policy providing coverage for work-related injuries (including coverage for medical expenses and lost compensation) sustained by any of Contractor's workers that meets the requirements of Applicable Law. Contractor may satisfy this requirement by maintaining a policy of either: (i) workers' compensation insurance; or (ii) if Applicable Law allows, occupational accident insurance that provides indemnification of workers' compensation benefits and expenses payable by or on behalf of Carrier and that becomes effective for a claim alleging employee status.

A)    <u>Workers' Compensation Insurance</u>. Contractor must maintain workers' compensation insurance as required by Applicable Law. The workers' compensation insurance policy: (i) must provide principal coverage in the state in which Carrier is headquartered, in the state in which Contractor is domiciled, and in any other state(s) in which, in Carrier's judgment, Contractor will have substantial operations on behalf of Carrier on or after the Effective Date; (ii) must not, if Contractor is a corporation, exclude officers from coverage; (iii) must provide "other states coverage" that excludes only the "Monopolistic States" (currently, North Dakota, Ohio, Washington, and Wyoming); and (iv) must provide, if available, an extended protection endorsement or provision to cover or reimburse Contractor (if not domiciled in a Monopolistic State) and Carrier for any benefits and expenses incurred as a result of a claim made by any of Contractor's workers in any of the monopolistic states. If Contractor is domiciled in any of the

DocuSign Envelope ID: 61133899-A2C8-4F84-9353-CE59C72C3DE9

Monopolistic States, Contractor must have state-fund coverage. Before operating the Equipment under this Agreement, Contractor must provide Carrier with a copy of a declarations page or, for state-fund coverage, a document showing Contractor's active enrollment, including, where applicable, certificates of current premium payment.

      B)    <u>Occupational Accident Insurance</u>. If workers' compensation insurance is not required under Section 14(b)(ii)(A) of this Agreement and Contractor elects not to obtain workers' compensation insurance, Contractor agrees to maintain occupational accident insurance, subject to the following conditions: (i) Contractor agrees to comply with all Applicable Law regarding occupational accident insurance, and Carrier's agreement to facilitate occupational accident insurance for any of Contractor's workers in such jurisdictions does not warrant that Contractor has complied with such conditions but instead is made in direct reliance on Contractor's representation that it has and will continue to do so; and (ii) before operating the Equipment under this Agreement, Contractor must provide Carrier with proof of all occupational accident insurance not facilitated by Carrier. The occupational accident insurance must have a minimum combined single limit of not less than $2,000,000 and a deductible of no greater than $0 and be no less comprehensive than the coverage Carrier may facilitate on Contractor's behalf if Contractor so chooses.

      iii)    <u>Other Insurance</u>. Contractor is responsible for maintaining any fire, theft, uninsured and/or underinsured motorist, physical damage (collision) to the Equipment, physical damage (collision) to Trailing Equipment, or other insurance coverage that Contractor may desire for the Equipment or for Contractor's health care or other needs. Contractor acknowledges that Carrier may, and Contractor authorizes Carrier to, waive, reject, or reduce no-fault, uninsured, and underinsured motorist coverage from Carrier's insurance policies to the extent allowed under Applicable Law, and Contractor agrees to cooperate in the completion of all necessary documentation for the waiver, election, rejection, or reduction.

c)    <u>Contractor's Insurance Coverages</u>. Contractor's insurance policies will be issued by insurance carriers that are A.M. Best "A"-rated or of equivalent financial strength in the commercially-reasonable judgment of Carrier. Such insurance may be furnished under any blanket policy carried by Contractor or under a separate policy therefor. Contractor shall furnish to Carrier documentation, such as current certificates of insurance, showing that all coverages required by this Agreement have been procured, that the coverages are being properly maintained, and that the premiums are paid. Each certificate furnished to Carrier must identify the insurance carrier, policy number, and expiration date, and show that Carrier has been named as an additional insured with primary and non-contributory coverage. Contractor's workers' compensation policy (if required by Section 14(b)(ii)(A) of this Agreement) must contain an alternate-employer endorsement in favor of Carrier. Contractor must provide, or cause its insurance carrier to provide, written notice to Carrier of cancellation or modification of the policy at least 30 days in advance. Contractor acknowledges that no claim to Carrier's workers' compensation policy exists at any time during the term of this Agreement.

d)    <u>Liability if Coverages Are Not Maintained</u>. Subject to the indemnity limits in Section 20(b) of this Agreement, Contractor agrees to defend, indemnify, and hold harmless Carrier from any loss, damage, fine, expense (including reasonable attorneys' fees), action, and claim for injury to persons (including death) or damage to property that Carrier may incur arising out of or relating to Contractor's failure to maintain the insurance coverages required by this Agreement. In addition, Contractor, on behalf of Contractor's insurer, expressly waives all subrogation rights against Carrier, and if a subrogation action is brought by Contractor's insurer, Contractor agrees to defend, indemnify, and hold Carrier harmless from that action.

DocuSign Envelope ID: 61133899-A2C8-4584-9353-CE59C72C3DE9

e)      Insurance Facilitated by Carrier. Contractor may authorize Carrier to facilitate, on Contractor's behalf, the insurance coverages listed in Appendix B. For each coverage elected by Contractor, Carrier will deduct or otherwise recover the amounts stated in Appendix B. If Contractor fails to provide proper evidence of the purchase or maintenance of the insurance required by Section 14(b) of this Agreement, Carrier is authorized but not required to obtain the insurance at Contractor's expense and deduct or otherwise recover the amounts stated in Appendix B. Contractor recognizes that Carrier is not in the business of selling insurance, and any insurance coverage requested by Contractor from Carrier is subject to all of the terms, conditions, and exclusions of the actual policy. Carrier will ensure that Contractor is provided with a certificates of insurance meeting the requirements of 49 C.F.R. § 376.12(j)(2) for each facilitated policy, and Carrier will provide Contractor with a copy of each policy upon request.

f)      Changes in Cost or Other Details of Coverages. If Contractor has elected an insurance coverage facilitated by Carrier and the cost or other details (as specified in the Certificate of Insurance in Appendix B) change, Carrier will notify Contractor in writing. Contractor will not be subject to the change until fifteen (15) days after the notice—or, if sooner, the time the third-party vendor has allowed—unless Contractor signs an addendum consenting to the change, in which case the change described in the addendum will go into effect immediately upon signing. **Otherwise, Contractor's failure to object to the change constitutes Contractor's consent to the change effective as of the date specified in the notice.** Carrier will provide Contractor with an updated Certificate of Insurance reflecting the change and, upon request, a copy of the insurance policy. If Contractor notifies Carrier of Contractor's objection within that period set forth in the notice and Contractor and Carrier are unable to resolve the matter to their mutual satisfaction, either party will have the right to terminate this Agreement immediately upon the change becoming effective.

15.      Purchase of Items from Carrier: Contractor is not required to purchase or rent any products, equipment, or services from Carrier as a condition of this Agreement. Any product, equipment, or service which Contractor elects to purchase or rent from Carrier shall be set forth with specificity in this Agreement and Appendix B. The terms of any contract under which Contractor elects any transaction that gives Carrier the right to make deductions from Contractor's gross invoice settlement will be specified in an Appendix or Addendum to this Agreement, or other supplemental form to this Agreement signed by the parties.

16.      Shortage, Loss or Damage to Cargo: Contractor will be responsible for the loading and unloading of freight under this Agreement and shall be compensated in the event of hand-loading or unloading in accordance with Appendix A. Contractor is responsible for making sure the freight is properly counted and is in apparently good condition when loaded and is responsible for viewing the freight when being unloaded. Contractor agrees to immediately report all cargo claims to Carrier, including all claimed shortages, overages, damages, or other exceptions to the cargo. If possible, Contractor agrees to notify Carrier of all cargo claims before leaving the customer's or consignee's location. Contractor's indemnity obligation to Carrier under Sections 20(a) and 20(b) of this Agreement will apply to each cargo claim, including but not limited to delay, shortages, misdelivery, and any direct damage claim relating to lost, damaged, or contaminated loads arising out of or relating to Contractor's services. Contractor authorizes Carrier to deduct or otherwise recover any such amounts. In the event of any such claim, Carrier will deliver to Contractor a written explanation and itemization of any deductions for cargo or property damage made from Contractor's invoice settlement prior to taking such deduction from Contractor's invoice settlement. Contractor agrees that it is liable and will reimburse Carrier for the entire amount of any claims paid by Carrier as the result of late delivery of shipments accepted by Contractor where such late delivery is the Contractor's fault. Carrier shall have the right to deduct the amount of such claims from Contractor's gross invoice settlement.

17.      Trailers: In the event either Carrier or a customer provides a trailer for the use of Contractor in providing its transportation services, Contractor shall inspect the trailer for prior damage and road worthiness. If Contractor notices any damage to the trailer or road unworthiness, Contractor shall immediately notify Carrier. Contractor shall not commence operation until the problem has been repaired.

a)   <u>Carrier's Responsibilities</u>. Carrier will be responsible for all expenses relating to regular maintenance of axles, brakes, and other electrical and mechanical systems, repairs of damage to trailing equipment attributable to reasonable wear and tear, and purchases of replacement tires for all of trailing equipment, provided these expenses are approved by Carrier before the work is performed.

b)   <u>Contractor's Responsibilities</u>. Contractor agrees to be responsible for daily pre-trip and post-trip inspections, proper inflation of tires, prompt informing of Carrier upon experiencing defective or mal-performing tires, brakes, or other electrical or mechanical features of trailing equipment, and proper lubrication. In addition, **subject to the indemnity limits in Section 20(b) of this Agreement**, Contractor agrees to be responsible for all repairs of all damage to trailing equipment other than ordinary wear and tear, and Contractor authorizes Carrier to deduct or otherwise recover all these amounts. All such repairs and maintenance will be performed at facilities designated or approved by Carrier. Contractor will be responsible for Carrier's actual costs in recovering any Carrier- or customer-provided trailer or trailing equipment for which Contractor has accepted dispatch and which Contractor has also wrongfully abandoned. In the event Contractor uses the trailers or trailing equipment for any other purpose, Carrier shall, in addition to any other remedies, be entitled to liquidated damages for the loss of use of each such trailer, as set forth in the Deductions Table. Unauthorized use of the trailers or trailing equipment shall constitute a material breach of this Agreement. Contractor authorizes Carrier to deduct or otherwise recover the amount of such liquidated damages.

c)   <u>Return of Trailer/Trailing Equipment</u>. Contractor agrees to return any trailing equipment in the same good condition as received by Contractor, reasonable wear and tear excepted, along with any and all other equipment and property belonging to Carrier immediately upon Carrier's request or upon termination of this Agreement. If trailing equipment is not in as good a condition as when it was delivered by Carrier (reasonable wear and tear excepted), Contractor authorizes Carrier to restore trailing equipment to proper condition and to charge back to Contractor the costs of these repairs or reconditioning. If Contractor for any reason fails to return trailing equipment, Contractor agrees to reimburse Carrier for all reasonable expense, including attorneys' fees, incurred by Carrier in recovery of trailing equipment. Contractor agrees that if it is necessary for Carrier to enter upon Contractor's private property or move Contractor's private property in order to recover trailing equipment, Contractor grants Carrier permission to do so. **Contractor agrees to defend, indemnify, and hold harmless Carrier (and Carrier's agents) from any form of liability whatsoever in connection with the repossession; such indemnity obligation will not be subject to the limits in Section 20(b) of this Agreement.**

d)   <u>Damage to Trailer/Trailing Equipment</u>. Not subject to the indemnity limits in Section 20(b) of this Agreement, Contractor will be liable for the entire amount for each incident involving damage—including but not limited to, repairs, storage while awaiting repair, towing or moving expense, and replacement costs for a total loss—arising out of or relating to Contractor's use of trailing equipment, Carrier's customer's trailers, other Carrier equipment, or equipment of any other carrier. Before deducting any such damage from Contractor's invoice settlement, Carrier will provide Contractor with a written explanation and itemization of the deduction.

18.   <u>Crashes, Accidents, Incidents, and Claims:</u> Contractor must immediately report to Carrier any crash, collision of the Equipment with any vehicle, object or person, accident (whether or not defined as an "accident" or "preventable" under this Agreement), incident, potential or actual claim, bodily injuries, losses or damages (including to cargo and to any Trailing Equipment), shortages, over-weights, or overages to Carrier involving Contractor's operations under this Agreement. If any such occurrence is not reported immediately to Carrier, Contractor: (i) will risk disqualification of Contractor's worker who failed to make the report and/or termination of this Agreement; and (ii) must, not subject to the indemnity limits in Section 20(b) of this Agreement, reimburse Carrier for all expense incurred as a result of the failure. Contractor's workers must cooperate fully with Carrier and Carrier's representatives and insurers (at Contractor's expense) with respect to any legal

DocuSign Envelope ID: 61133899-A2C3-4584-9353-CE59C72C3DE9

action, hearing, or other proceeding arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder, including provision of written reports or affidavits, attendance at hearings, and trials and assistance in securing evidence or obtaining the attendance of witnesses.

19.   **Indemnification by Carrier**:

a)   **In General**. **Carrier agrees to defend, indemnify, and hold harmless Contractor (and Contractor's affiliates, subsidiaries, officers, agents, and employees) from any claim (including any for which Contractor is covered by Carrier's insurance) of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation ("Contractor Damages") that Contractor pays or otherwise incurs arising out of or relating to Carrier's (including Carrier's agents' or employees') negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions. This indemnity obligation will not apply to any claim of loss or damage to the Equipment or to Contractor's other property, or to any claim arising out of or relating to Contractor's workers' operation of the Equipment for any purpose other than the performance of Contractor's obligations under this Agreement. Carrier's indemnity obligations do not apply when the Equipment is being operated pursuant to an Addendum for Alternative Uses of Equipment. Contractor agrees to furnish Carrier with a written explanation and itemization of any claim for cargo or property damage. This section will remain in full force and effect both during and after the termination of this Agreement. Carrier will credit to Contractor's next invoice settlement any amounts due Contractor under this section.**

b)   **Indemnity Limits**. **Carrier's indemnity obligation under Section 19(a) of this Agreement will be limited to a maximum of $3,000 of the total amount in Contractor Damages that Contractor paid or otherwise incurred per occurrence, and in no event will Carrier's indemnity obligation under Section 19(a) of this Agreement exceed $3,000 where multiple claims arise in combination out of any one occurrence.**

20.   **Indemnification by Contractor**:

a)   **In General**. **Contractor agrees to indemnify, defend, save and hold harmless Carrier (and its affiliates, subsidiaries, officers, agents, and employees) from any and all direct, indirect, or consequential loss, damage, delay, fine, civil penalty, action claim for injury or death to persons (including to Carrier's employees or agents), damage to property, environmental response or restoration expense, cargo loss or damage, loss of or damage to Carrier-provided trailers or Carrier's other real or personal property, injunctive obligations, or other expense that Carrier pays or otherwise incurs, including reasonable attorneys' fees and costs of litigation, arising out of or relating to any of Contractor's workers' negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions ("Carrier Damages"). Contractor authorizes Carrier to deduct or otherwise recover any amounts due to Carrier under this section. If any of Contractor's drivers operate the Equipment for any purpose other than the carriage of Carrier's lading, Contractor agrees to defend, indemnify, and hold harmless Carrier (and its affiliates, subsidiaries, officers, agents, and employees) from any Carrier Damages arising from that operation. This section will remain in full force and effect both during this Agreement and after its termination.**

b)   **Indemnity Limits**. **Contractor's indemnity obligation for Carrier Damages is limited—except as expressly provided elsewhere in this Agreement—to paying Carrier up to the lesser of: (i) the deductible or self-insured retention amount as set forth in Appendix B (if any) under those of Carrier's insurance policies**

applicable to the claim; or (ii) the amounts of Carrier Damages stated in the Deductions Table for the indicated categories of claims. None of those dollar limits will apply to any liquidated damages owed to Carrier or to any Carrier Damages resulting from the operation of the Equipment not on behalf of Carrier. In addition, the indemnity limits stated in the Deductions Table will apply only to Contractor's indemnity obligation for Carrier Damages and will not limit in any way the losses, damages, attorneys' fees, or other expenses that Contractor may sustain as a result of an injured third-party's assertion of a claim directly against Contractor. The indemnity limits provided for in this Section and stated in the Deductions Table shall not apply to the extent Carrier Damages arise out of or relate to any of Contractor's workers' gross negligence or willful misconduct (including but not limited to intentional torts).

c)      **Carrier's Coverages**. Carrier has secured insurance coverages that may cover risks and liabilities for which Contractor has agreed to indemnify Carrier under (for example, public liability insurance). Such policies are expressly for the benefit of Carrier and only incidentally may benefit Contractor. Terms of the policies may change (for example, higher or lower deductibles, length of coverage, UM/UIM waivers or limitations, or insurance underwriters). Contractor has neither any obligations under the policies nor any rights under their terms.

d)      **Claims by Contractor or Other Contractors**. Notwithstanding Section 20(a) of this Agreement, and not subject to the limits of Section 20(b) of this Agreement, Contractor agrees to defend, indemnify, and hold harmless Carrier from: (i) any claim by Contractor for loss of or damage to the Equipment or Contractor's other property (and any related fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation) due to the negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions of any of Contractor's workers; and (ii) any claim by any other contractor of Carrier for loss of or damage to the other contractor's truck, tractor, trailer, or other property (and any related fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation) due to the negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions of any of Contractor's workers.

e)      **Reclassification**. THE TERMS OF THIS AGREEMENT REFLECT THAT CONTRACTOR IS AN INDEPENDENT CONTRACTOR, NOT AN EMPLOYEE. THEREFORE: Notwithstanding Section 20(a) and not subject to the indemnity limits in Section 20(b) of this Agreement, Contractor agrees to defend, indemnify, and hold harmless Carrier from all reasonable attorneys' fees and litigation expenses Carrier incurs in defending against any claims, suits, actions, or administrative proceedings brought by any of Contractor's workers, or, at Contractor's instance or with Contractor's consent, by any union or other private organization or member of the public, alleging that any of Contractor's workers is an employee of Carrier, but which ultimately, upon completion of all appeals or the running of all applicable appeal periods, fail to result in any final judicial or administrative decision holding the allegation to be true.

21.    Communications.

a)      ELD. To serve Carrier's customers' shipment-tracking demands and help fulfill government requirements, including compliance with the hours-of-service regulations, Contractor must maintain in the Equipment an on-board communications system and electronic logging device ("ELD"). Contractor may either provide an ELD that is fully interoperable with Carrier's platform or elect to obtain one through Carrier by making such an election in Appendix B. If Contractor elects to obtain an ELD through Carrier:

        i)      Carrier-Furnished ELD. Carrier will, at Contractor's expense, furnish, install, and maintain in an operable condition an ELD in the Equipment. Contractor will immediately return the ELD to Carrier upon

Carrier's request or the termination of this Agreement. If the ELD is lost, damaged as a result of Contractor's negligence, or not returned upon request or upon termination of this Agreement, Contractor authorizes Carrier to deduct or otherwise recover the entire expense incurred by Carrier in recovering, repairing, or replacing the ELD. Carrier will not be responsible for any loss or damage to the Equipment arising or resulting from the installation, use, or removal of the ELD. If Contractor replaces the unit(s) of Equipment, Contractor will bear the expense of removal and re-installation of the ELD in the replacement Equipment, and Contractor authorizes Carrier to deduct or otherwise recover all such expense.

   ii) <u>Usage Fee</u>. Carrier will deduct or otherwise recover a usage fee for the ELD in the amount stated in the Deductions Table.

  b) <u>Safe Use of Communications Devices</u>. Applicable Law prohibits the handheld use of mobile phones by drivers operating commercial motor vehicles except in an emergency when such use is necessary to communicate with law enforcement officials or other emergency services. Violations of this prohibition may impact driving safety and result in civil penalties against Carrier. **As a result, Contractor agrees to ensure that Contractor's drivers comply with Applicable Law and customer specifications regarding use of mobile phones and ELDs while operating the Equipment. Failure to comply with such prohibitions or limitations may result in disqualification of the driver involved and/or termination of this Agreement.**

  c) <u>Privacy Disclosures and Consent Form</u>. Appendix C describes the categories of data collected by the ELD, the uses to be made of such data by Carrier, and the right of Contractor driver(s) to review certain of the data upon request.

  d) <u>Consent to Telephonic Communications</u>. Contractor hereby authorizes, under the Telephone Consumer Protection Act and any other Applicable Law, Carrier, any agent of Carrier, or any person otherwise authorized to communicate on Carrier's behalf, to contact Contractor at the Contractor telephone number(s) appearing in the Signature Block after the main text of this Agreement, or otherwise provided to Carrier by Contractor before, on, or after the Effective Date, including any telephone number associated with a cellular phone, via any method, including but not limited to live, person-to-person communications and by automatic telephone dialing system.

22. <u>Deductions:</u>

  a) <u>Invoice Settlement</u>. Contractor authorizes Carrier to charge back to or deduct from Contractor's gross invoice settlement, escrow fund, or any money owed to Contractor all amounts Contractor owes to Carrier, as listed or referenced in the Deductions Table or elsewhere in this Agreement, resulting in a net amount, if any, to be remitted to Contractor. Contractor may revoke any or all such authorizations, except to the extent the authorization relates to any cost, expense, or amount already incurred by or owed to Carrier; to be effective, the revocation must be provided to Carrier in writing pursuant to Section 28 of this Agreement. If Contractor owes Carrier a net amount following any settlement, Contractor agrees to immediately pay Carrier that amount. Carrier has the right to recover, through all legal means, any such amounts Contractor owes Carrier. Contractor agrees not to charge any amounts to Carrier'ns account, or to execute or endorse any instrument for or on behalf of Carrier, without Carrier's advance written permission. Contractor and Carrier will not incur or authorize any other debts in the name of the other.

  b) <u>Documentation</u>. Carrier will deliver to Contractor a written explanation and itemization of any deductions for cargo or property damage before they are made. With respect to all charge-back items and deductions, Contractor, upon request, will be afforded copies of those documents which are necessary to determine the validity of the charge.

c)      Changes to Deductions Table. Carrier will notify Contractor in writing of a change to the amount of any item listed or referenced in the Deductions Table. Contractor will not be subject to that change until at least fifteen (15) days after the notice—or, if sooner, the time the third-party vendor has allowed—unless Contractor signs an addendum consenting to the change, in which case the change described in the addendum will go into effect immediately upon signing. **Otherwise, Contractor's failure to object to the change constitutes Contractor's consent to the change effective as of the date specified in the notice.** If Contractor notifies Carrier of Contractor's objection within that period and Contractor and Carrier are unable to resolve the matter to their mutual satisfaction, either party will have the right to terminate this Agreement immediately upon the change becoming effective.

23.    Confidentiality and Trade Secrets:

a)      Protection of Confidential Matters. Contractor acknowledges that any list of Carrier's customers is a valuable, special, and unique asset of the business of Carrier. Contractor agrees that during and after the term of this Agreement Contractor's workers: (i) will not disclose the list of Carrier's customers or any part thereof to any third party for any reason without Carrier's prior written consent; (ii) will preserve as "Confidential Matters" all trade secrets, know how and information relating to Carrier's business, forms, processes, developments, sales and promotional systems, prices and operations, which information may be obtained from tariffs, contracts, freight bills, letters, reports, disclosures, reproductions, books, records, or other contractors, and other sources of any kind resulting from this Agreement; and (iii) will regard the Confidential Matters as the sole property of Carrier, and will not publish, disclose or disseminate the same to others without the written consent of Carrier. In the event of any material breach or threatened material breach by any of Contractor's workers of this section, Carrier will be entitled to an injunction, restraining Contractor's workers from disclosing, in whole or in part, the list of Carrier's customers, and all other Confidential Matters. Carrier will be irreparably damaged in the event of any material breach of this provision by Contractor. Accordingly, in addition to any other legal or equitable remedies that may be available to Carrier, Contractor agrees that Carrier will be able to seek and obtain immediate injunctive relief in the form of a temporary restraining order without notice, preliminary injunction, or permanent injunction against Contractor's workers to enforce this confidentiality provision and that Carrier will not be required to post any bond or other security and will not be required to demonstrate any actual injury or damage to obtain injunctive relief from the courts. Nothing in this section should be construed as prohibiting Carrier from pursuing any remedies available to Carrier at law or in equity for the material breach, including the recovery of monetary damages from Contractor.

b)      Notice Required by 18 U.S.C. § 1833(b)(3). To the extent the Confidential Matters constitute "trade secrets" under 18 U.S.C. § 1839(3), Carrier provides the following notice to Contractor pursuant to 18 U.S.C. § 1833(b)(3): An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

24.    Escrow Funds: Carrier may require an escrow fund under the following terms:

a)      Principal Amount: Contractor must maintain in the escrow fund the Principal Amount stated in the Deductions Table, to be funded by deductions from Contractor's gross invoice settlement at the rate(s) set forth in the Deductions Table beginning the first week Contractor provides services under this Agreement and continuing until the Principal Amount is reached. If the amount in the escrow fund falls below the Principal Amount, Contractor

authorizes Carrier to deduct from Contractor's gross invoice settlement at double the indicated rate until the Principal Amount is reached.

b)      Specific Items: The specific items for which Carrier may deduct from the escrow fund under the terms of this Agreement are those items specified in the Deductions Table of this Agreement.

c)      Accountings: While the escrow fund is under the control of Carrier, Carrier shall provide an accounting to Contractor of any transaction involving the escrow fund by clearly indicating in individual Settlement Statements the amount and description of any deduction or addition made to the escrow fund. Furthermore, at Contractor's request, Carrier will provide a separate accounting of any transactions involving the escrow fund.

d)      Interest: While the escrow fund is under the control of Carrier, Carrier shall pay interest on the escrow fund on at least a quarterly basis. For purposes of calculating the balance of the escrow fund on which interest must be paid, Carrier will deduct a sum equal to the average advance made to Contractor during the period of time for which interest is paid. The interest rate shall be established on the date the interest period begins and shall be at least equal to the average yield or equivalent coupon issue yield on 91-day, 13-week U.S. Treasury bills as established by the Department of Treasury at the beginning of the quarter.

e)      Return of Escrow Fund: In no event will the balance in the escrow fund (less any final deductions) be returned to Contractor later than 45 days from the date of termination of this Agreement ("Escrow Fund Return Period"). At the time of the return of any balance in the escrow fund, Carrier may deduct monies for all Escrow Items. Carrier will not make deductions from the escrow fund for items for which, by the end of the Escrow Fund Return Period after termination of this Agreement, neither Contractor nor Carrier has yet made expenditure or incurred a quantified, legally binding obligation to pay. Carrier will provide a final accounting to Contractor of all final deductions made from the escrow fund within the Escrow Fund Return Period from the date of termination of this Agreement.

f)      Excess Funding. Contractor at its election may deposit funds above the required Principal Amount required by Carrier with Carrier for Contractor's unrestricted use. Carrier will fully comply with Section (a) through (e) with respect to such funds reserving its full rights of deduction.

25.    Identification of Equipment and Obligations Upon Termination:

a)      Identification of Equipment. During the period of this Agreement, and while the Equipment is being operated on behalf of Carrier, the Equipment shall be identified in accordance with all applicable federal regulations. Before placing the Equipment in Carrier's service, Contractor agrees to apply such identification to the Equipment as Carrier may designate under Applicable Law, provided that Contractor must first remove any items that, in Carrier's reasonable judgment, would interfere with this identification or be offensive. Carrier will have the right to place and maintain on the Equipment Carrier's name and any lettering, advertisement, slogans, or designs as Carrier may choose. Contractor agrees to remove or cover up this identification at the termination of this Agreement, or while operating the Equipment for any purpose other than conducting Carrier's business. Contractor agrees to keep the Equipment in clean appearance and identified as described herein, at Contractor's expense. Contractor agrees to display its business name and address on the Equipment in a manner that is consistent with Applicable Law.

b)      Obligations Upon Termination. Contractor agrees that upon the later of: (1) termination of this Agreement, or (2) completion of the services provided for herein, Contractor will promptly remove and return all Carrier

DocuSign Envelope ID: 61133899-A3C8-4584-9353-CE59C72C3DE9

placards and other identification devices, if any, and return all such items—or provide a letter certifying removal—to Carrier, together with all of Carrier's property (in good working condition), Carrier-owned trailers, permits, load-securement equipment, and freight all to Carrier's nearest terminal, and to pay Carrier all amounts Contractor then owes Carrier under this Agreement. If Contractor fails to do so, Contractor agrees to pay Carrier all expenses incurred by Carrier in returning those items to good working condition and in seeking the return of the items, including reasonable attorneys' fees and collection costs. Carrier may pursue all other remedies allowed by law or authorized in this Agreement against Contractor. If Carrier's identification numbers are "painted," Contractor will warrant or exhibit to Carrier or its agent that the painted numbers have been removed from the Equipment.

c)      <u>Final Settlement</u>. Upon termination of this Agreement, Carrier may hold final settlement, including escrow funds, until Contractor removes and returns to Carrier, as set forth in Subsection (b) above, all of Carrier's identification devices, or a letter certifying that such devices have been lost or stolen.

26.   <u>Passenger Authorization</u>: As required by 49 C.F.R. § 392.60, Contractor agrees not to allow any passengers to ride in the Equipment without authorization in writing by Carrier, which will be given only if: (i) all of Contractor's workers and the passenger submit to Carrier a fully executed Passenger Authorization and Release of Liability form; and (ii) Contractor furnishes Carrier a Certificate of Insurance for passenger-liability coverage meeting all the requirements of Section 14 of this Agreement, as well as Appendix B, or elects to have Carrier facilitate the coverage. Carrier will deduct or otherwise recover from Contractor the costs associated with obtaining Passenger Authorization. Contractor agrees not to permit any passenger to operate or be in charge of the Equipment at any time for any purpose whatsoever, or to be outside the cab during loading or unloading.

27.   <u>Waiver of Class, Collective, Consolidated, and Representative Actions</u>:  **Contractor and Contractor's workers waive any right to initiate, join (i.e., opt in to), remain in (i.e., not opt out of), or otherwise participate in any class action, collective action, consolidated action, or representative action brought against Carrier, including but not limited to such actions brought under state or federal law and those arising under the Fair Labor Standards Act.**

28.   <u>Notices</u>: All notices must be in writing (unless permitted elsewhere in this Agreement to be oral) and will be deemed to have been fully given: (i) upon delivery if delivered in person, by facsimile transmission, or electronic means; (ii) on the next day after being deposited with an overnight delivery company with the express charges prepaid; or (iii) on the date indicated on the return receipt, or if there is no receipt, on the third day after being deposited in the United States Mail with first-class postage prepaid. The parties agree to be under a continuing duty to provide written notice to each other regarding changes to any of the contact information.

29.   <u>Consent to do Business by Electronic Methods</u>: Carrier and Contractor consent to do business using any electronic method permitted by FMCSA. This consent includes, but is not limited to, the use of electronic methods to effect and transmit the signature of any document, including this Agreement and any supplement, modification, addendum, amendment, notice, consent and/or waiver required by this Agreement, or any other document required by FMCSA regulations to be generated and maintained (or exchanged by private parties). The parties agree that when either party uses any electronic method to accomplish electronic signatures, the chosen method: (i) identifies and authenticates the sender as the source of the electronic communication; (ii) indicates the sender's approval of the information contained in the electronic communication; and (iii) produces an electronic document with the same integrity, accuracy, and accessibility as a paper document or handwritten signature. Either party may elect to use a handwritten signature with respect to any document, provided that the election will not preclude the other party from using an electronic signature to the same document.

30.   <u>Benefits and Assignment</u>: This Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective successors. This Agreement, including obligations under this Agreement, is not assignable by Contractor without the prior written consent of Carrier, though Contractor remains free to engage workers to perform

services under this Agreement. Carrier may assign or subcontract this Agreement or any rights or obligations hereunder without the prior written consent of Contractor.

31.    Entire Agreement: This Agreement, including its Appendices and addenda, constitutes the entire agreement and understanding between the parties and shall not be modified, altered or changed without the express written consent of both parties, except as otherwise provided in Sections 14(f) and 22(c) of this Agreement. In the event of any inconsistent provisions, the terms and conditions of signed appendices and addendums shall take priority.

32.    Waiver: A waiver by Contractor or Carrier of any provision of this Agreement shall not be deemed a waiver of any other provision, nor will any waiver constitute a continuing waiver. No waiver will be deemed effective or binding unless executed in writing by the party making the waiver. The failure or refusal of a party to insist upon the strict performance of any provision of this Agreement, or to exercise any right under this Agreement, will not be construed as a waiver of the provision or right, nor will the failure or refusal be deemed a customary practice contrary to the provision or right. The rights and remedies of Carrier under this Agreement or under Applicable Law are cumulative, and the exercise of any of them will not be exclusive of any other right or remedy provided by this Agreement or allowed under Applicable Law.

33.    Multiple Copies: Carrier will keep the original of this Agreement, and Contractor agrees to keep one (1) copy for Contractor, and keep one (1) copy in the Equipment at all times during the term of this Agreement.

34.    Jurisdiction and Venue: Except for Section 38, this Agreement will be governed by the laws of the United States and of Arkansas, without regard to the choice-of-law rules of that or any other jurisdiction. The parties agree that any claim or dispute arising from or in connection with this Agreement, or with respect to any aspect of the relationship between the parties, whether under state, local, foreign or federal law (including but not limited to 49 C.F.R. Part 376), must be brought exclusively in Benton County, Arkansas, but only to the extent it is not within the scope of the parties' agreement to arbitrate as set forth in Section 38. The parties consent to the jurisdiction of these courts.

35.    Severability: If any provision (including any sentence or part of a sentence) of this Agreement is deemed invalid for any reason, this Agreement will be void only as to that provision, and this Agreement will remain otherwise binding between the parties. Any provision deemed voided will be replaced with provisions that will be as close to the parties' intent as permissible.

36.    No Third-Party Beneficiaries: Nothing in this Agreement creates any rights in any party not a signatory to or expressly designated as a third-party beneficiary herein.

37.    Credits and Debits under Previous Agreements: Balances in escrow funds created under any previous written agreement between the parties will be credited to the escrow fund created under this Agreement (if any). All invoice settlement amounts and other amounts due Contractor from Carrier, and all advances and other amounts due Carrier from Contractor, under the previous agreement, will remain due and payable. The amounts of invoice settlement for trips started, and the amounts of advances and other amounts due Carrier, before the Effective Date of this Agreement will be determined by the previous agreement, the invoice settlement procedures will be determined by this Agreement, and the invoice settlement timing will be determined by the predecessor agreement or this Agreement, whichever requires settlement earlier.

38.    Agreement to Arbitrate:  Except as provided in Subparagraph (a) of this Section 38, any dispute (including requests for preliminary or permanent injunctive relief) between the parties from or relating to (or alleged to arise from or relate to): (a) this Agreement (b) the business relationship between the Parties; (c) and any acts, omissions, conditions, or events relating to the parties occurring during the term of this Agreement, including, without limitation, to those arising from or relating to any other agreement(s) between the parties; (d) breach of contract; (e) tortious conduct; or (f) violation or cause of action under the statutes, regulations, common law, or other requirements of any applicable government authorities,

whether local, state, Federal, or foreign, including but not limited to the Fair Labor Standards Act, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Employee Retirement Income Security Act, and other Federal labor, employment, or transportation law, and State labor, employment, or transportation law (together, "Claims"), shall be submitted to final and binding arbitration. This Agreement (including the parties' agreement to arbitrate disputes) will be subject to and is not exempt from the scope of the Federal Arbitration Act (9 U.S.C. § 1 et seq.). If a court of competent jurisdiction issues a final ruling holding that this Agreement is exempt from mandatory arbitration under the Federal Arbitration Act, then this Agreement (including the parties' agreement to arbitrate disputes) will be governed by the Georgia Arbitration Code (O.C.G.A § 9-9-1, et seq). The arbitration will be held in Benton County, Arkansas and governed by the Commercial Arbitration Rules of the American Arbitration Association, as then in effect, and the procedures set forth herein.

(a) <u>Claims Not Subject to Agreement to Arbitrate.</u> The parties' agreement to arbitrate Claims does not apply to: (i) Claims within the subject matter jurisdiction of a small claims court and advances only an individual (non-class, non-collective, non-consolidated, and non-representative) Claim; (ii) Claims for workers' compensation, state disability insurance, or unemployment insurance benefits; (iii) Claims brought before an administrative agency if applicable law grants exclusive jurisdiction over the Claim to such an agency notwithstanding the existence of an agreement to arbitrate; (iv) statutory claims for public injunctive relief ; and (v) Claims for indemnification; (vi) Claims for breach of Section 23 (Confidentiality and Trade Secrets); and (vii) Claims brought under the California Private Attorneys' General Act (Cal. Lab. Code § 2698, et seq.) ("PAGA") pursuant to which Contractor seeks to recover a civil penalty or penalties (i.e. a recovery a portion of which is allocated to the California Labor and Workforce Development Agency) on behalf of anyone who has provided services to Carrier other than Contractor. For the avoidance of doubt, private disputes pursuant to which Contractor seeks claimant-specific relief (e.g. statutory damages), including claims alleging violations of the California Labor Code that may underlie or predicate the PAGA claim for civil penalties, are covered by the mandatory arbitration provisions in this Section 38 unless applicable law requires that they be adjudicated before an administrative agency notwithstanding the existence of an agreement to arbitrate.

(b) <u>Issues Delegated to Arbitrator.</u> An arbitrator shall decide all issues arising from or relating to the interpretation or application of this Section 38 (including its subparagraphs), including the enforceability, revocability or validity of this Section 38 or any portion of it, except for the issue of the availability of class, collective, consolidated, or representative arbitration of claims, which issue shall be reserved.

(c) <u>Waiver.</u> THE PARTIES AGREE THAT NO CLASS, COLLECTIVE, CONSOLIDATED, OR REPRESENTATIVE ARBITRATION OF CLAIMS IS PERMITTED TO BE BROUGHT IN THE ARBITRATION PROCEEDING AND THAT THE ARBITRATOR IS NOT EMPOWERED TO CERTIFY, CONDUCT, OR AWARD RELIEF IN ANY SUCH ARBITRATION. IF A COURT OR ARBITRATOR NEVERTHELESS ALLOWS OR REQUIRES A CLASS, COLLECTIVE, CONSOLIDATED, OR REPRESENTATIVE ARBITRATION, THE PARTIES AGREE THAT SUCH A DECISION IS IMMEDIATELY APPEALABLE TO THE STATE OR FEDERAL COURTS SERVING BENTON COUNTY, ARKANSAS AS CONTRARY TO THE INTENT OF THE PARTIES AND THAT ALL ARBITRAL PROCEEDINGS, INCLUDING DISCOVERY, SHALL BE STAYED PENDING THE OUTCOME OF THE APPEAL. IN THE EVENT THE DECISION IS NOT REVERSED ON APPEAL, THE PARTIES AGREE THAT THIS SECTION 38 IN ITS ENTIRETY, AND ANY PRIOR OR SUBSEQUENT ARBITRATION AWARD UNDER IT, SHALL BE NULL AND VOID, AND ANY CLAIMS BETWEEN THE PARTIES SHALL BE RESOLVED BY COURT ACTION, NOT ARBITRATION, IN THE STATE OR FEDERAL COURTS FOR BENTON COUNTY, ARKANSAS. IF AT ANY POINT THIS PROVISION IS DETERMINED TO BE UNENFORCEABLE, THE PARTIES AGREE THAT THIS PROVISION SHALL NOT BE SEVERABLE, UNLESS IT IS DETERMINED THAT THE ARBITRATION WILL STILL PROCEED ON AN INDIVIDUAL BASIS ONLY.  THE PARTIES

UNDERSTAND THAT BY AGREEING TO ARBITRATION, THEY ARE WAIVING THEIR RIGHT TO TRIAL BY JURY.

(d) <u>Arbitration Fees and Expenses.</u> Each Party shall pay its own arbitration filing fees and an equal share of the fees and expenses of the arbitrator and the cost of the arbitration site, provided that if Contractor operates only one vehicle in its business, Carrier will pay the full fees and expenses of the arbitrator and the full cost of the arbitration site and the (i) full arbitration filing fee, if Carrier is the claimant, or (ii) the portion of the filing fee that exceeds the filing fee then in effect for civil actions in the United States District Court for the district that includes Contractor's place of residence, if Contractor is the claimant. In all other circumstances, the parties are responsible for their own arbitration expenses, including its attorneys' fees, provided that if the arbitrator finds that Contractor is entitled to recovery of attorneys' fees under applicable law, nothing in this Section 38 prohibits that recovery (but Carrier reserves any and all defenses to such a recovery under applicable law).

(e) <u>Right to Opt Out of Arbitration.</u> The agreement to arbitrate is not a condition of Contractor's business relationship with Carrier. If Contractor does not want to be subject to this Section 38, Contractor may opt out of the agreement to arbitrate by notifying Carrier in writing within thirty (30) days of the date this Agreement is signed by the Contractor. If Contractor elects to opt out, the written notice must be delivered either (i) by email to legal@jbhunt.com, stating Contractor's name and intent to opt out of this Section 38 or (ii) by sending a letter by U.S. Mail, delivery service (FedEx, etc.), or by hand to Sr. VP Legal and Litigation and General Counsel, Legal Department, J.B Hunt Transport, Inc., 615 J.B. Hunt Corporate Drive, Lowell, AR 72745. The original or a copy of the opt-out notice shall be maintained by Carrier. SUCH UNILATERAL ELECTION BY CONTRACTOR SHALL NOT RESULT IN TERMINATION OF THIS AGREEMENT OR ANY OTHER AGREEMENT BETWEEN THE PARTIES OR ANY FORM OF PENALTY, RETALIATION, OR DISADVANTAGE TO CONTRACTOR.

(f) <u>Miscellaneous.</u> If any provision (including any sentence or part of a sentence) of this Section (including its subparagraphs) except for the waiver in Section 38(c) is found to be invalid by a court or arbitrator, this Section 38 shall be void only as to such provision, and the remainder of the provision will continue to bind the parties. Any provision voided by operation of the foregoing shall be replaced with provisions that shall be as close to the parties' original intent as permitted under applicable law. No waiver of any of the provisions of this Section 38 shall constitute a waiver of any other provisions of the Agreement whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be deemed effective or binding upon either party unless set forth in writing executed by the party making the waiver. The failure or refusal of either party to insist upon the strict performance of any provision of this Section 38 or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver of the provision or relinquishment of the right, nor shall the failure or refusal to exercise the provision or right be deemed a customary practice or course of performance contrary to the provision or right. The rights and remedies of either party under this Section 38 or under applicable law shall be cumulative, and the exercise of any of them shall not exclude the exercise of any other right or remedy provided or allowed under applicable law.

39. <u>Survival</u>: If, up to and including the date of termination of this Agreement, one or more events occur that give rise, before or after that date, to a liability or entitlement of Contractor or Carrier under this Agreement, the liability or entitlement will continue until it is satisfied in full, notwithstanding the termination of this Agreement. Contractor's obligations include, but are not limited to, completing performance in the event of termination.

**NOTICE: THIS IS A BINDING LEGAL DOCUMENT. The parties acknowledge that each has the right and opportunity to fully review the Agreement prior to signing and, if each so elects, seek the assistance of legal counsel of its own choosing. By signing this Agreement, Contractor (i) represents it has read this Agreement; (ii) has sought and received the advice of an attorney or, if not, has chosen not to do so; and (iii) is entering into this Agreement freely, voluntarily, and without duress, undue influence, coercion, or promise of any benefit not specifically described in this Agreement.**

This Agreement begins at 12:01 a.m. <u>9/23/2020</u> ("Effective Date").

---

**By signing below, Contractor acknowledges that, as reflected in this Agreement:**

- **Contractor is NOT an employee of Carrier, and all aspects of the relationship between Contractor and Carrier are based on Contractor's status as an independent contractor.**

- **Contractor has agreed to be responsible for the operating expenses incurred in connection with Contractor's business operations.**

- **Contractor's agreement to take responsibility for Contractor's expenses is an indispensable term of this Agreement but for which Carrier would not have agreed to pay the gross invoice settlement amounts stated herein, or have entered into this Agreement.**

- **The gross invoice settlement amounts Carrier agrees to pay is not intended to ensure that Contractor can pay for Contractor's operating expenses. Instead, it is intended to provide the amount of revenue to Contractor sufficient to convince, in the market for transportation services, a contractor both to provide, maintain, fuel, legally-credential, and otherwise operate suitable and dependable Equipment and to provide and pay a qualified professional driver (or drivers) to operate the Equipment.**

- **The gross invoice settlement amounts paid to Contractor is MORE than Carrier would pay an employee to perform driving services, which reflects the reality of the marketplace, in that Carrier cannot attract contractors willing to take the entrepreneurial risk of running their own businesses by paying merely the personal-services wage they could earn as employees.**

---

**Carrier: J.B. Hunt Transport, Inc.**
**Operating under U.S. DOT No.: 80806**

By: _Will C.J._____
Signature of Authorized Representative

_____William Dietrich_____
Name (Printed)

_____Sr Vice President Operations_____
Title

615 J. B. Hunt Corporate Drive
P.O. Box 130
Lowell, Arkansas 72745
(479) 820-0000

9/14/2020
_____
Date

**Contractor:**  John Licitra
_____

By: _____
Signature of Authorized Representative

John Licitra
_____
Name (Printed)

Mr
_____
Title

████████████
_____
Address (Street, P.O. Box, etc.)

Northlake, IL, 60164
_____
City, State, and Zip Code

████████
_____
Phone Number

████████████████
_____
Email Address

9/12/2020
_____
Date

SS or FEIN #: _____



**Appendix A to the**
**Intermodal Independent Contractor Operating Agreement**

**Gross Settlement and Deductions Table—Chicago, IL**

1. Gross Settlement: Pursuant to Section 5 of the Agreement, Carrier will pay Contractor gross settlement comprising the amounts in the table below:

| Invoice Settlement Items | Rate/Amount |
|---|---|
| Chassis Flip | $30 per hour |
| Contractor Orientation | $75 per day |
| Cross-town Linehaul – Loaded (Per Load) Zone 1 | $32 |
| Cross-town Linehaul – Loaded (Per Load) Zone 2 | $50 |
| Cross-town Linehaul – Loaded (Per Load) Zone 3 | $70 |
| Cross-town Linehaul – Loaded (Per Load) Zone 4 | $100 |
| Customer Refused Load | $65 |
| Detention | *See* Section 1(c) of this Appendix A |
| Driver Assist | $25 per occurrence |
| Dunnage | $25 per occurrence |
| Empty Search | $32 per occurrence |
| Empty Trailer Repositioning | $32 per occurrence |
| Fuel Surcharge | *See* Surcharge Schedule attached as Appendix A-1 |
| Hazmat Load | $40 |
| Layover (Each 24 Hours excluding Weekends) | N/A |
| Linehaul-Loaded (Per Mile) | $1.00; See Section 1(a) of this Appendix A |
| Linehaul-Empty (Per Mile) | $1.00; See Section 1(a) of this Appendix A |
| Live Lift | $30 per occurrence |
| Mechanical Breakdown | $30 per hour |
| Milwaukee Market Surcharge | $75 per occurrence |
| Operational Meetings | $30 per hour |
| Overweight Rework Load | $30 per hour |
| Pick-up / Delivery (Drop/Hook) | $69 |
| Pick-up / Delivery (Live) | $90 |
| Rail Delay | $30; *See* Section 1(e) of this Appendix A |

| Refrigerated Load | $32 |
|---|---|
| Optional Incentive | $1,000/Month; See Section 1(d) of this Appendix A |
| Safety Training | $30 per hour |
| Spot J.B. Hunt Equipment | $10 per occurrence |
| Stop-Offs | N/A |
| Truck Ordered Not Used (TONU) | $30 per occurrence |

| Chicago Rail Ramp | Zone Designations |
|---|---|
| BNSF – Corwith | 1 |
| BNSF – Cicero | 1 |
| BNSF – LPC | 4 |
| BNSF – Willow Springs | 2 |
| Norfolk Southern – 47th Street | 1 |
| Norfolk Southern – Landers | 2 |
| Norfolk Southern – 63rd Street | 1 |
| Norfolk Southern – Calumet | 3 |
| CSX – Bedford Park | 2 |
| CSX – 59th Street | 1 |
| Canadian National – Harvey | 3 |
| Union Pacific – Chicago | 1 |
| Union Pacific – Dolton | 3 |
| Union Pacific – Global IV | 4 |

a)      Mileage. When rates are based on mileage, mileage will be determined as set forth in Section 5(b) of the Agreement.

b)      Driver Referral Settlement. Carrier will pay Contractor additional settlement for referrals of company drivers or independent contractors who hire on or contract with Carrier, in accordance with the J.B. Hunt Driver Referral Bonus Policy.

c)      Detention Settlement. To the extent Carrier bills, and Carrier's customer pays, for detention related to Contractor's services, and provided such item is not rejected by Carrier's customer as a result of Contractor's service failure, Carrier will pay Contractor for detention as follows: (i) Contractor, or Contractor's driver, is detained longer than 1 hours at a customer location; (ii) Contractor's, or Contractor's driver's, arrival at the customer location is not late; and (iii) Contractor, or Contractor's driver, has not caused a service failure related to the shipment-at-issue. Detention time will start at the later of Contractor's arrival at the customer location or the scheduled arrival time. After 1.5 hours of detention, the settlement amount passed through to Contractor is $30.00 per hour, excluding any time Contractor, or Contractor's driver, is legally required to be off duty or taking a break, up to $90.00.  All detention settlement will be paid in 15-minute increments, as follows:

| Detention Minutes Incurred | Detention Hours Paid |
|---|---|
| 0-7 minutes | 0 hours |
| 8-22 minutes | ¼ hour the hourly rate |
| 23-37 minutes | ½ hour the hourly rate |
| 38-52 minutes | ¾ hour the hourly rate |
| 53-60 minutes | 1 hour |

d)      Optional Incentive Settlement. As an incentive for Contractor's drivers' safe performance of services, availability, and performance of error-free services, needed to meet the needs of Carrier's customers, Carrier shall pay Contractor additional settlement, in the amount stated in the table above, as applicable pursuant to this subsection. Contractor is eligible for such additional settlement if subparts (i) through (v) are all satisfied for the then-applicable one-calendar-month period. Notwithstanding anything to the contrary, Contractor acknowledges and agrees Contractor is free to decide whether to meet the eligibility criteria for optional-incentive settlement and nothing in this subsection is intended to restrict or prohibit Contractor's ability to accept or reject any load or work assignment pursuant to this Agreement.

(i)      Subject to Applicable Law and safety considerations, Contractor accepts all shipments tendered by Carrier.

(ii)     Contractor's driver does not incur any service failure. For purposes of this Section 1(c), a "service failure" means: (a) Contractor's driver's late pick-up or delivery, except if caused by a late release, weather or other acts of God, construction, accident, prior stops, Carrier's or the customer's scheduling error, overweight, or acts of a public enemy; (b) Contractor's driver causes a preventable accident (as defined in the Agreement) that affects any Carrier BASIC score or safety rating; or (c) Contractor's driver is responsible for an overage, shortage or damage claim.

(iii)    Contractor is available to accept load tenders for a minimum of twenty (20) days in the calendar month.

(iv)     If Contractor's driver is stopped for a DOT roadside inspection, Contractor's driver passes the inspection with No Violations Discovered.

e)      Rail Delay Settlement. Carrier will pay rail delay settlement when Contractor is physically sitting in line while a train is blocking the tracks, prohibiting exit/entrance from the rail or delays while locating equipment. After 1 hour of detention, the settlement amount passed through to Contractor is $30.00 per hour, excluding any time Contractor, or Contractor's driver, is legally required to be off duty or taking a break, up to $90.00.  All detention settlement will be paid in 15-minute increments as follows:

| Rail Delay Minutes Incurred | Rail Delay Hours Paid |
| --- | --- |
| 0-7 minutes | 0 hours |
| 8-22 minutes | ¼ hour the hourly rate |
| 23-37 minutes | ½ hour the hourly rate |
| 38-52 minutes | ¾ hour the hourly rate |
| 53-60 minutes | 1 hour |

f)      Driver Referral Settlement. Carrier will pay Contractor additional settlement for referrals of company drivers or independent contracts who hire on or contract with Carrier, in accordance with the J.B. Hunt Driver Referral Bonus Policy.

g)      Customer Specifications.  Pursuant to the Agreement, Contractor agrees to comply with customer specifications. Customer specifications include, but are not limited to, the following:

1.      Contractor agrees to transport such shipments that it accepts, from and to such points between which service may be required, as indicated by Carrier's customer, without delay, subject to Carrier's customer's specific shipment instructions.

2.      Contractor agrees to perform loading and unloading services as required by Carrier's customer. Each bill of lading or receipt is to be signed by Contractor, or Contractor's driver, and will show the kind, condition and quantity of commodities

DocuSign Envelope ID: 61133899-A2C3-4584-9353-CE59C72C3DE9

received and delivered by Contractor, or Contractor's driver, at the loading and unloading points,

3.      Contractor understands and agrees that time is of the essence in the pickup, transportation and delivery of individual shipments and that it agrees to meet all prearranged pickup and delivery times.

4.      Contractor agrees Carrier's customer requires, and Contractor will use best efforts to provide, 98% on-time performance.  Carrier's customer may require that Contractor, or Contractor's driver, is removed from its account in the event of two service failures within a quarter. A Service Failure includes driver error or mechanical error.  A Service Failure does not include Carrier's customer or receiver delays, railroad, dispatch error, weather, abnormal traffic flow, and/or other Acts of God.

5.      In the event Contractor attempts to deliver a shipment for Carrier's customer and, at the delivery point, such shipment is refused or rejected by the consignee, or Contractor is unable to deliver it for any reason, Contractor agrees to notify Carrier in order to receive disposition instructions from Carrier's customer. Contractor shall provide constant and sufficient security and safety for the shipment until such disposition instructions are received.

h)      <u>Primary Traffic Lanes or Area of Service</u>. Within 250-mile radius of Chicago, IL.

*[Signatures on following page]*

**This Appendix A is agreed to by the undersigned parties on the latest date set forth below.**

**Carrier: J.B. Hunt Transport, Inc.**

By: _____

Signature of Authorized Representative


_____William Dietrich_____
Name (Printed)


_____Sr Vice President Operations_____
Title

615 J. B. Hunt Corporate Drive
P.O. Box 130
Lowell, Arkansas 72745
(479) 820-0000


9/14/2020
_____
Date

**Contractor:** ___John Licitra_____

By: _____

Signature of Authorized Representative

John Licitra
_____
Name (Printed)

Mr
_____
Title

████████████
_____
Address (Street, P.O. Box, etc.)

Northlake Il 60164
_____
City, State, and Zip Code

████████
_____
Phone Number

████████████████
_____
Email Address

9/12/2020
_____
Date

SS or FEIN #: _____ _____



## Appendix B to the
## Intermodal Independent Contractor Operating Agreement

### Contractor Elections, Deductions Table and Insurance Details

1.   Contractor Elections:

**Tolls**: Contractor must elect **ONE** of the following options; however, if Contract elects Option 1 below, Contractor must also elect Option 1 for both the Base Plate and Contractor-Eligible Permits sections, and Option 2 in the Weight Station Vendor section below.

_____   **OPTION 1**   Contractor will, at Contractor's sole cost, obtain any necessary toll devices and directly pay applicable toll authorities toll costs and any other related amounts Contractor incurs. Notwithstanding anything to the contrary, if Contractor charges any toll cost to Carrier's account, Contractor authorizes Carrier to deduct or otherwise recover such cost pursuant to Section 22 of this Agreement.

___X___   **OPTION 2**   Contractor elects to pay Carrier the flat fee identified in the Deductions Table, which the parties agree such fee covers the cost of tolls and Contractor's usage of Carrier-provided toll device(s). Contractor agrees to return any Carrier-provided toll device(s) immediately upon Carrier's request or termination of this Agreement, whichever occurs first. Contractor authorizes Carrier to deduct or otherwise recover such cost pursuant to Section 22 of this Agreement.

_____   **OPTION 3**   Contractor elects to purchase necessary toll device(s) through Carrier's facilitation at the cost identified in the Deductions Table. In addition, Contractor agrees to pay for all charges incurred using such toll device(s) and authorizes Carrier to deduct or otherwise recover such cost incurred on behalf of Contractor pursuant to Section 22 of this Agreement.

**Base Plate**: Contractor must elect **ONE** of the following options pursuant to Section 13(e) of the Agreement.

_____   **OPTION 1**   Contractor will obtain plate(s) for the Equipment.

___X___   **OPTION 2**   Carrier will obtain apportioned plate(s) under the International Registration Plan or state-only plate(s) for the Equipment (whichever is applicable) and deduct or otherwise recover the amount stated in the Deductions Table in Appendix B.

DocuSign Envelope ID: 6113J899-A2C3-4F84-9353-CE59C72C3DE9

**Contractor-Eligible Permits**: Contractor must elect **ONE** of the following options pursuant to Section 13(f) of the Agreement.

    _____    **OPTION 1**   Contractor will obtain Contractor-eligible permits.

    ___X___    **OPTION 2**   Carrier will obtain Contractor-eligible permits, and Carrier will deduct or otherwise recover the amount stated in the Deductions Table in Appendix B.

**ELD**: Contractor must elect **ONE** of the following options pursuant to Section 21(a) of the Agreement.

    _____    **OPTION 1**   Contractor will furnish an ELD for use in the Equipment.

    ___X___    **OPTION 2**   Carrier will furnish an ELD to Contractor for use in the Equipment.

**Fuel and Mileage Tax Reporting**: Contractor must elect **ONE** of the following options pursuant to Section 13(g) of the Agreement. **In the event Contractor chooses to modify this election in the future, Contractor must notify Carrier and such modification will not go into effect until the beginning of the next calendar quarter.**

    _____    **OPTION 1**   Contractor will obtain and pay any required fee for IFTA permits and will perform all fuel and mileage tax reporting with respect to the Equipment at Contractor's expense.

    ___X___    **OPTION 2**   Carrier will obtain and pay any required fee for the IFTA permit and will perform all fuel and mileage tax reporting services with respect to the Equipment. Any fees associated with the IFTA permit will be deducted from Contractor's invoice settlement.

**Weight Station Vendor:** Contractor must elect **ONE** of the following options:

    _____    **OPTION 1**   Contractor elects to utilize a weight station vendor facilitated by Carrier (e.g. Drivewyze)

    ___X___    **OPTION 2**   Contractor elects **NOT** to utilize a weight station vendor facilitated by Carrier (e.g. Drivewyze)

        Base Plate

        Base Plate State

        Device Serial Number

2.      Deductions Table:    Pursuant to Section 22 of this Agreement, Contractor authorizes Carrier to deduct or recover the items in the Deductions Table below. Where no figure is listed, the deductions will vary in amount and will be computed as indicated.

| CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OR METHOD OF COMPUTATION OF DEDUCTION |
|---|---|
| **Adjustments** to revenue-based invoice settlement amounts | *See* Section 5(d) of this Agreement |
| **Advance check** | If Contractor elects, with Carrier's prior written consent, to use an advance check to pay any of Contractor's expenses under this Agreement, Carrier will charge back the amount advanced. Carrier may advance funds to Contractor one (1) time per calendar month. |
| **Advances** of Contractor's invoice settlement amounts loaded onto Carrier's Advance Card, or such other card as provided by Carrier, for Contractor's use | Amount Carrier advanced to Contractor (loaded onto the Advance Card). If Carrier receives any discount, rebates, or credits on Contractor's use of the Advance Card, Carrier will retain such discounts and rebates as an admin fee, except as otherwise provided in this Deductions Table. Carrier may advance funds to Contractor one (1) time per calendar month. |
| **Base Plate(s)** | If Contractor elects Carrier to obtain an apportioned plate under the International Registration Plan or a state-only plate for the Equipment (whichever is applicable), Carrier will deduct or otherwise recover the annual estimated amount Carrier will owe the issuing jurisdiction for the plate, computed on the basis of $40.00 per week, which will be adjusted to match the actual amount billed to Carrier, which includes an admin. fee to Carrier. |

| CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OR METHOD OF COMPUTATION OF DEDUCTION |
|---|---|
| **Claims** for Carrier Damages and other indemnity obligations owed by Contractor to Carrier under this Agreement | For Carrier Damages (as defined in Section 20(a) of this Agreement), the amount of Carrier Damages that Carrier paid or otherwise incurred, subject to the following limits (only if applicable under Section 20(b) of this Agreement): 1. $1,500.00 for Carrier Damages related to bodily injury, physical damage, or environmental restoration. 2. $500.00 for Carrier Damages related to cargo loss or damage. 3. $1,500.00 for Carrier Damages related to loss of or damage to Trailing Equipment or Carrier's other property. In no event will Contractor's indemnity obligation for Carrier Damages exceed $3,000.00 in combination where multiple claims of any and all kinds arise out of one occurrence. For other indemnity obligations owed by Contractor to Carrier under this Agreement, the amount stated in the applicable provision. |
| **Collision-Avoidance Technology** pursuant to Section 1(c)(v) of Appendix A (only if applicable) 1. Charges for loss of or damage to Collision-Avoidance Technology 2. Installation and Service Fees 3. Usage fee | 1. Amount paid to third-party vendor or incurred by Carrier 2. Amount paid to third-party vendor or incurred by Carrier (Amount charged back to Contractor for costs associated with Collision-Avoidance Technology device, installation, and service fees will be capped at $50.00 per week until paid in full) 3. $23.00 per month per device |
| **CSA Monitoring Service** pursuant to the Addendum for Alternative Uses of Equipment (if applicable) | Amount paid to third-party vendor or otherwise incurred by Carrier |
| **Detention, accessorial, and other customer-charge revenue** not collected by Carrier from Carrier's customer because of Contractor's failure to transmit to Carrier the necessary documentation supplied by the customer | Amount Carrier was unable to collect from Carrier's customer as a result of Contractor's failure to transmit to Carrier the necessary documentation supplied by Carrier's customer, provided that no charge back will be made if Contractor contacted Carrier's dispatch regarding issue prior to departure from Carrier's customer (consignor or consignee) location |
| **Drug and alcohol testing** to the extent it is Contractor's responsibility under Section 10 of this Agreement | Amount Carrier paid third-party vendor(s) |

| CHARGE-BACK OR<br>OTHER DEDUCTION ITEM | AMOUNT OR METHOD OF<br>COMPUTATION OF DEDUCTION |
|---|---|
| **ELDs**<br><br>**1. Charges** for loss of or damage to ELD; monthly data costs<br><br>**2. Equipment Usage fee** for ELD<br><br>**3. Liquidated damages** for Contractor's late return of ELD | 1. Amount paid to third-party vendor or incurred by Carrier<br><br>2. $20.00 per week for each unit.<br><br>3. $50.00 per day, up to $2,000, until ELD(s) is returned, as liquidated damages to cover the cost to Carrier for the loss of use |
| **Equipment inspection** charges when performed at a qualified repair shop or at Carrier's shop | Amount Carrier paid third-party vendor, or if Contractor elects to obtain products or services from Carrier's affiliated maintenance and parts vendor, the amount Carrier incurred for parts and labor plus markups resulting in prices, which will be provided to Contractor at the time Contractor places order |
| **Equipment lease charges** | *See* **Addendum for Equipment Lease Charges** |
| **Escort fee** pursuant to Section 12(d) of this Agreement | Amount Carrier paid to escort |
| **Escrow Fund** | **Principal Amount:**<br><br>**1. $3000**, to be deducted, under Section 24(a) of this Agreement, at $100 per week; unless an alternative amount is set forth at the end of this box and<br><br>**2. $1000**, to be deducted under Section 24(a) of this Agreement, at $25 per week for costs associated with Collision Avoidance Technology, if applicable.<br><br>ALTERNATIVE ESCROW AMOUNT:<br>$ _____. |
| **Express mail, U.S. First Class Mail, or other package delivery services** if Contractor charges them to Carrier's account with the delivery service vendor | Amount Carrier paid to U.S. Postal Service or other package delivery service vendor |
| **Fines and penalties, including traffic tickets** and related court costs, attorneys' fees, and other legal expenses, pursuant to Sections 13(c) and 13(d) of this Agreement | Amount Carrier paid or otherwise incurred |

DocuSign Envelope ID: 61133899-A2C3-4584-9352-CE59C72C3DE9

| CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OR METHOD OF COMPUTATION OF DEDUCTION |
|---|---|
| **Fuel and oil purchases** that Contractor elects to make at Carrier's fuel facility, or using an Advance Card | 1. For fuel and oil purchases that Contractor elects to make at Carrier's fuel facility, Carrier will deduct the amount Carrier paid the third-party fuel vendor, plus markups to Carrier resulting in prices that will be provided to Contractor at the time Contractor purchases fuel.<br><br>2. For fuel and oil purchases that Contractor elects to make from third-party fuel vendors in Carrier's fuel network, using Carrier Advance Card (or such other similar card provided by Carrier), if applicable, Carrier will deduct (and show on Contractor's Settlement Statement) or otherwise recover an amount computed by multiplying the number of gallons or other units purchased by a price no greater than the price-per-unit posted at the fuel vendor's facility. The amount deducted as a result of Carrier sharing with Contractor 100% of the overall discount Carrier has negotiated with the fuel vendor or Advance Card issuer, if applicable. |
| **Fuel and Mileage Tax Reporting** | Carrier will deduct or otherwise recover a flat charge of $0.50 per week, comprising the permit fees and Carrier's tax reporting admin. fee. Any additional fuel tax that Contractor may owe will be separately deducted or otherwise recovered by Carrier. If Contractor fails to provide Carrier complete and accurate fuel-tax records in time for Carrier's computation, on the seventh day of each month, of Carrier's fuel and mileage tax reports and payments for the preceding month, Carrier will compute Contractor's fuel use taxes based on total miles dispatched by Carrier at a rate of 4 miles-per-gallon. |
| **Garnishment orders** | Amount Carrier paid in compliance with any lawfully issued order or lien, a copy of which Carrier will supply to Contractor at or before the first deduction relating to it, plus an admin. fee to Carrier in the amount authorized by Applicable Law. After termination of, but not during, this Agreement, Carrier will deduct from Contractor's Escrow Fund (after all deductions authorized by this Deductions Table) the portion of any garnishment or lien amount due that exceeds the balance in Contractor's invoice settlement amounts. |
| **Insurance coverages** | *See* Section 3(b) of this <u>Appendix</u>. |
| **Load locks** if Contractor elects to purchase these through Carrier | Amount Carrier paid third-party vendor |

| CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OR METHOD OF COMPUTATION OF DEDUCTION |
|---|---|
| **Maintenance, repairs, parts, and replacement tires** for Equipment if Contractor elects, and Carrier agrees, to have Carrier advance funds for the purchase | Amount Carrier paid third-party vendor or, if Contractor elects to obtain products or services from Carrier's affiliated maintenance and parts vendor, the amount Carrier incurred for parts and labor, plus markups resulting in prices which will be provided to Contractor at the time Contractor places order. An admin. fee to Carrier of $50.00 will be charged to Contractor. If Contractor elects to pay the third-party vendor directly, using a Carrier advance check, see "Advance Check" row in the Deductions Table. |
| **Medical examinations** to the extent Section 12(g) of this Agreement requires Contractor to pay for them | Amount Carrier paid third-party vendor |
| **Motor vehicle reports** | Amount Carrier paid to third-party vendor. |
| **Non-exchanged pallets** | Amount Carrier paid its customer(s) |
| **Operating expenses not otherwise listed** in this Deductions Table which are the responsibility of Contractor under this Agreement and which Contractor requests that Carrier pay initially on Contractor's behalf. | Amount Carrier paid or otherwise incurred |
| **Performance completion charges** under Section 12(c) of this Agreement for Carrier's cost of completing a shipment or other assignment Contractor undertakes but does not complete for any reason (including Contractor's dropping a load at a facility Carrier operates or utilizes rather than at the consignee's location) | $50.00 per occurrence, up to the full amount Carrier paid or otherwise incurred under Section 12(c) of this Agreement. If non-completion is excusable in Carrier's reasonable judgment, invoice settlement will be paid to Contractor for the portion of the trip Contractor successfully completed. |
| **Permits** pursuant to Section 13(f) of this Agreement | Amount Carrier paid issuing jurisdiction or otherwise incurred for the permit. |
| **Roadside Assistance Program** | See the most recent Coverage Overview. |
| **Short-Term Tractor Rental** if Contractor elects to rent, through Carrier, a substitute tractor | See Addendum for Short-Term Tractor Rental |
| **Termination-related expenses** pursuant to Section 25(b) of this Agreement | Amount Carrier paid or otherwise incurred if repairs or other services are performed by a third-party vendor. If repairs or other services are performed by Carrier, the amount Carrier incurred for parts and labor plus a mark-up, resulting in prices which will be provided to Contractor immediately after Carrier completes the work competitive with other vendors in the relevant market(s).

If Contractor fails to return Carrier's equipment and/or property, as set forth in Section 25(b), $50.00 per day until all required items are returned, as liquidated damages to cover the cost to Carrier of the loss of use |

| CHARGE-BACK OR<br>OTHER DEDUCTION ITEM | AMOUNT OR METHOD OF<br>COMPUTATION OF DEDUCTION |
|---|---|
| **Tolls** for highways, bridges, tunnels, ferries, and other facilities | If Contractor elects Option 1 in the Tolls-related election part of this <u>Appendix</u>, Contractor will be charged any toll cost Contractor incurs and charges to Carrier's account.<br><br>If Contractor elects Option 2 in the Tolls-related election part of this <u>Appendix</u>: Contractor will be charged a weekly fee of $100.00, plus a 5.00 flat fee if operating in California, per unit of Equipment. Carrier will retain any volume-related discounts or rebates it receives from any toll authority. Contractor will also be charge a one-time flat fee of $16.00 for the toll device.<br><br>If Contractor elects Option 3 in the Tolls-related election part of this <u>Appendix</u>: Contractor will be charged a one-time fee ($16.00 for Easy Pass), plus a $5.00 flat fee if operating in California, per toll device, as well as the actual toll costs incurred by Contractor and charged to Carrier's account. Contractor will also be charge a one-time flat of $16.00 for the toll device. |
| **Trailing equipment repair, return, reconditioning, indemnity, and related expense** pursuant to Section 17 of this Agreement | Amount Carrier paid or incurred. If Contractor elects to obtain such products and services from Carrier's affiliated maintenance and parts vendor, the amount Carrier incurred for parts and labor, plus markups resulting in prices which will be provided to Contractor at the time Contractor places order<br><br>If Contractor uses a Carrier-provided trailer for any purpose other than to perform services under the Agreement, or as otherwise agreed to by Carrier or Carrier's customer, $50.00 per day plus $0.20 per mile of unauthorized use. *See* Section 17(b) of this Agreement. |
| **Transflo** expense if Contractor elects to use this service to expedite delivery of Contractor's trip documents to Carrier | Amount Carrier paid third-party vendor |
| **Uniforms** if Contractor elects to order through Carrier | Amount Carrier paid third-party vendor |
| **Weight Station Vendor (e.g. Drivewyze)** | $10.00 per month |

3.  <u>Insurance</u>:

    a)  <u>Insurance Limits, Deductibles, and Other Details</u>.

        i)  <u>Carrier's Public Liability Insurance</u>. Carrier will maintain either: (i) commercial public liability insurance that has a combined single limit of not less than the dollar amounts required by 49 U.S.C. § 13906 and FMCSA regulations promulgated thereunder, with a deductible

DocuSign Envelope ID: 6113B899-A3C8-4584-9363-CE59C72C3DE9

or self-insured retention $1,000,000; or (ii) a public liability self-insurance program approved by FMCSA.

> ii)   <u>Carrier's Cargo Insurance</u>. Carrier will maintain either: (i) commercial cargo insurance that has a limit of not less than $1,000,000 per occurrence, with a deductible or self-insured retention of $100,000 for flood-related claim; or (ii) a cargo self-insurance program.

> iii)   <u>Contractor's Work-Injury Insurance</u>. If workers' compensation insurance is required by Section 14(b)(ii) of this Agreement, such insurance will provide principal coverage in Arkansas.

> iv)   <u>Contractor's Passenger Insurance</u>. If Contractor is permitted to carry passengers, Contractor's passenger insurance will provide coverage to Contractor whenever the Equipment is being operated (whether or not on behalf of Carrier) in a combined single limit of not less than $100,000 for injury or death to any person riding as a passenger in the Equipment or for damages to that person's property in any one occurrence. In addition, such coverage shall be primary to any other insurance that may be available from Carrier.

> v)   <u>Contractor's Other Insurance</u>. The state in which Carrier's insurance policies are delivered and under whose law Contractor, pursuant to Section 14(b)(iii) of this Agreement, authorizes Carrier to waive, reject, or reduce no-fault, uninsured, and underinsured motorist coverage from those policies is Arkansas.

b)   <u>Certificate of Insurance</u>: Contractor is not required to purchase insurance from or through Carrier.  In fact, Carrier desires Contractor to purchase insurance on its own and to provide certificates of insurance pursuant to the Agreement.  If Contractor, at its option, desires to purchase any insurance through Carrier's independent agent, this Section of the Appendix must be completed and the Appendix must be signed by Contractor and Carrier.

Contractor requests that Carrier facilitate on Contractor's behalf the insurance coverages Contractor has selected by placing Contractor's initials on the "Yes" line in the right-hand column below (titled "Election"):

| **Non-Trucking Liability Insurance** | | **Election** |
|---|---|---|
| Name of Insurer: | *See* the most recent Coverage Overview | |
| Policy No: | *See* the most recent Coverage Overview | |
| Effective Date(s): | *See* the most recent Coverage Overview | YES ___X___ |
| Amount of Coverage: | *See* the most recent Coverage Overview. | |
| Cost to Contractor: | *See* the most recent Coverage Overview | NO _____ |
| Deductible: | *See* the most recent Coverage Overview | |

| | Election |
|---|---|
| **Occupational Accident Insurance**<br><br>Name of Insurer:    *See* the most recent Coverage Overview<br><br>Policy No:    *See* the most recent Coverage Overview<br><br>Effective Date(s):    *See* the most recent Coverage Overview<br><br>Amount of Coverage: *See* the most recent Coverage Overview<br><br>Cost to Contractor:    *See* the most recent Coverage Overview<br><br>Deductible:    *See* the most recent Coverage Overview | YES  _X_<br><br><br>NO  _____ |
| **Physical Damage Insurance on Tractor**<br><br>Name of Insurer:    *See* the most recent Coverage Overview<br><br>Policy No:    *See* the most recent Coverage Overview<br><br>Effective Date(s):    *See* the most recent Coverage Overview<br><br>Amount of Coverage: *See* the most recent Coverage Overview<br><br>Cost to Contractor:    *See* the most recent Coverage Overview<br><br>Deductible:    *See* the most recent Coverage Overview | YES  _____<br><br><br>NO  _X_ |
| **Health Insurance (Contractor's Spouse and/or Family)**<br><br>Name of Insurer:    *See* the most recent Coverage Overview<br><br>Policy No:    *See* the most recent Coverage Overview<br><br>Effective Date(s):    *See* the most recent Coverage Overview<br><br>Amount of Coverage: *See* the most recent Coverage Overview<br><br>Cost to Contractor:    *See* the most recent Coverage Overview<br><br>Deductible:    *See* the most recent Coverage Overview | YES  _____<br><br><br>NO  _X_ |

DocuSign Envelope ID: 61133899-A2C3-4584-9352-CE59C72C3DE9

| Deductible Buyback Insurance | Election |
|---|---|
| **Name of Insurer:** *See* the most recent Coverage Overview<br><br>**Policy No:** *See* the most recent Coverage Overview<br><br>**Effective Date(s):** *See* the most recent Coverage Overview<br><br>Amount of Coverage: *See* the most recent Coverage Overview<br><br>Cost to Contractor: *See* the most recent Coverage Overview<br><br>Deductible: *See* the most recent Coverage Overview | YES  _____<br><br><br>NO  __X__ |

*[Signature Page Follows]*

**This Appendix B is agreed to by the undersigned parties on the latest date set forth below.**

**Carrier:  J.B. Hunt Transport, Inc.**

By: _____

Signature of Authorized Representative


_____William Dietrich_____

Name (Printed)


_____Sr Vice President Operations_____

Title

615 J. B. Hunt Corporate Drive
P.O. Box 130
Lowell, Arkansas 72745
(479) 820-0000


9/14/2020
_____

Date

**Contractor:**   John Licitra

By: _____

Signature of Authorized Representative

John Licitra
_____

Name (Printed)

Mr
_____

Title

█████████████
_____

Address (Street, P.O. Box, etc.)

Northlake Il 60164
_____

City, State, and Zip Code

████████
_____

Phone Number

█████████████████
_____

Email Address

9/12/2020
_____

Date

4813-0058-7635, v. 1



## J.B. Hunt Transport, Inc.

### APPENDIX C TO THE INDEPENDENT CONTRACTOR OPERATING AGREEMENT

### Privacy Disclosure and Consent Form

**1.   Requirement and Purpose of Certain Devices**

Contractor agrees to maintain in each unit of Equipment (as defined in Section 3 of this Agreement) a compliant and functioning ELD. The principal purpose of this requirement is to assist Contractor's drivers and Carrier in complying with any applicable hours-of-service regulations and other Applicable Law and in avoiding adverse safety scores and FMCSA interventions under CSA. The ELD may also assist in providing load dispatching and tracking services to meet the specifications of Carrier's customers.

Contractor may elect to use Carrier-furnished Collision-Avoidance Technology, the purpose of which is set forth in the related paragraph in Section 1 of Appendix B.

**2.   Categories of Electronic Information Collected**

The ELD is capable of collecting various categories of data regarding the Equipment and its operation (collectively "ELD Electronic Information"), including but not limited to the: name of the driver and any co-driver(s), and corresponding driver identification information; duty status (that is, "Off Duty," "Sleeper Berth," "Driving," and "On-Duty Not Driving"); date and time the Equipment is in operation; location of the Equipment; distance travelled (including when the Equipment crosses state lines); name and DOT number of Carrier; 24-hour period starting time; multiday basis used by Carrier to compute cumulative duty hours and driving time; hours in each duty status for the 24-hour period, and total hours; Equipment number; load information, such as shipping document number(s), or name of shipper and commodity(ies); fuel use, including when the Equipment is refueled; speed of the Equipment; hard-braking events; and power-on self-tests and diagnostic error codes. The ELD Electronic Information is transmitted from the Equipment and either to the third-party vendor of the ELD (as identified below) and then from the third-party vendor to Carrier or directly to Carrier. Carrier may access certain categories of the ELD Electronic Information in furtherance of its efforts to comply with Applicable Law, including hours-of-service regulations, or to meet customer specifications.

The Collision-Avoidance Technology is capable of collecting event-related data when triggered by unsafe operating conditions, as disclosed in writing by Carrier to Contractor ("Collision-Avoidance Electronic Information"). Together, ELD Electronic Information and Collision-Avoidance Electronic Information is referred to as "Electronic Information."

**3.** __Carrier Uses of Electronic Information__

Carrier stores and has access to the Electronic Information and reserves the right to do so for at least as long as the Equipment with the installed ELD and/or Collision-Avoidance Technology operates under lease to Carrier, and for a reasonable time thereafter. Contractors or their drivers who have questions about the safeguards Carrier has put in place regarding the storage of Electronic Information may contact Carrier.

**4.** __Right to Review Electronic Information__

Contractor's workers will have the right, on written request to Carrier, to review the collected Electronic Information that Carrier itself continues to have access to, but only Electronic Information relating to the person making the request. A written request for such a review should be addressed to Carrier and sent by email or U.S. Mail to the address listed in the Signature Block following the main text of this Agreement.

**This Appendix C is agreed to by the undersigned parties on the latest date set forth below.**

**Contractor:** _John Licitra_

By: _____
Signature of Authorized Representative

_JOHN LICITRA_
Name (Printed)

_9/12/2020_
Date

**Driver (if applicable):**

_____
Signature

_____
Name (Printed)

_____
Date

4812-5531-9425, v. 2

J.B. Hunt Transport, Inc. Independent Contractor Agreement
Appendix C – Page 2



**Independent Contractor Operating Agreement**
**Appendix D**
**Receipt for Equipment and**
**Certificate of Authorized Operation**

1. <u>**Owner Information**</u>

   Name of Owner: JOHN LICITRA _____

   Address: ██████████████ _____
   (Street Address)

   Northlake Il 60164 _____
   (City, State, Zip code)

2. <u>**Description of Tractor covered by this Agreement**</u>

   ***Equipment must be ELD-compatible and otherwise appropriate for the operations for which it is leased under the Independent Contractor Operating Agreement.**

   Tractor #: 388981 _____ (Assigned by Carrier)

   Make: volvo _____         _____

   Year: 2007 _____   VIN #: ██████████ ___

   Tractor Weight: 15,000 _____

   Wheel Base: 215 _____

   Fifth Wheel Height: 47 _____

   License # ████████ _____   State: IN _____

   Date/Time/Location Tractor Placed in Service:  09 / 15  2012 _____

   Hub Reading at Time Tractor Placed in Service:  400,000 _____

3. <u>**Owners Certification:**</u>

   I certify that the information described above is correct to the best of my knowledge.

   DocuSigned by:
   *John Licitra*
   —0B5DF081D06C401
   (Signature)

   JOHN LICITRA
   (Typed or Printed Name)

   9/12/2020
   (Date)

DocuSign Envelope ID: 61133899-A2C3-4534-9353-CE59C72C3DE9

SS# ████████



Independent Contractor Operating Agreement

**Appendix E**
**On-Board Computer (OBC) Operations**

1. <u>Non-Use While in Motion</u>: Contractor hereby represents to Carrier that the OBC will not be used while tractor is in motion. If, and only if, a tractor is being operated by a team, then the non-driver may use the OBC while the tractor is in motion.

2. <u>Maintenance</u>: Contractor shall protect the OBC from damage and abuse so as to keep the OBC in good repair, condition and working order during the term of this agreement, normal wear and tear excepted. Carrier will at its own cost and expense, repair or replace a damaged or defective OBC. Contractor shall promptly notify Carrier of any problems associated with the OBC.

3. <u>Risk of Loss</u>: Contractor shall bear the entire risk of loss, damage or destruction of the OBC resulting from any theft, fire, accident or other casualty whatsoever. Contractor shall promptly notify Carrier of any such loss. Contractor shall pay Carrier the amount as set forth in the compensation and fee schedule for any such loss.

4. <u>OBC Return</u>: Upon termination of this Agreement for any reason:

   (a) Contractor shall deliver the tractor to such point as requested by Carrier for removal of the OBC. Contractor shall return OBC in the same condition as when received, normal wear and tear excepted.
   (b) In the event Contractor fails to return the OBC within (3) days of termination, Contractor agrees to pay Carrier the liquidated damages as set forth in Appendix B of the Agreement. Carrier reserves the right to deduct such amount from Contractor's escrow funds as necessary to satisfy this obligation.
   (c) In the event Contractor fails to return the OBC as requested, Carrier shall be entitled to receive the costs and expenses (including reasonable attorneys' fees) incurred by Carrier in recovering such OBC. Carrier shall make the necessary set-offs and deductions as required.

Date OBC Received by Independent Contractor: _09/29_____, 20_17___.

Acknowledgement of Receipt of OBC: _____
                                        (Contractor Signature)

                                   JOHN LICITRA
                                   _____
                                        (Typed or Printed Name)



# Intermodal

**Appendix A-1 to**
**Intermodal Independent Contractor Operating Agreement**

**Fuel Surcharge Schedule**

| DOE Average | | | Surcharge per Mile | | Temp Fuel Relief | | Total Payout/Mile |
|---|---|---|---|---|---|---|---|
| 1.55 | to | 1.63 | 0.06 | | 0 | | 0.06 |
| 1.64 | to | 1.70 | 0.07 | | 0 | | 0.07 |
| 1.71 | to | 1.80 | 0.08 | | 0 | | 0.08 |
| 1.81 | to | 1.90 | 0.09 | | 0 | | 0.09 |
| 1.91 | to | 2.00 | 0.10 | | 0 | | 0.10 |
| 2.01 | to | 2.10 | 0.11 | | 0.02 | | 0.13 |
| 2.11 | to | 2.20 | 0.12 | | 0.02 | | 0.14 |
| 2.21 | to | 2.30 | 0.13 | | 0.02 | | 0.15 |
| 2.31 | to | 2.40 | 0.140 | | 0.02 | | 0.16 |
| 2.41 | to | 2.50 | 0.150 | | 0.02 | | 0.17 |
| 2.51 | to | 2.60 | 0.160 | | 0.03 | | 0.19 |
| 2.61 | to | 2.70 | 0.170 | | 0.03 | | 0.20 |
| 2.71 | to | 2.80 | 0.180 | | 0.03 | | 0.21 |
| 2.81 | to | 2.90 | 0.190 | | 0.05 | | 0.24 |
| 2.91 | to | 3.00 | 0.200 | | 0.05 | | 0.25 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3.01 | to | 3.10 | | 0.210 | | 0.06 | 0.27 |
| 3.11 | to | 3.20 | | 0.220 | | 0.06 | 0.28 |
| 3.21 | to | 3.30 | | 0.230 | | 0.06 | 0.29 |
| 3.31 | to | 3.40 | | 0.240 | | 0.07 | 0.31 |
| 3.41 | to | 3.50 | | 0.250 | | 0.07 | 0.32 |
| 3.51 | to | 3.60 | | 0.260 | | 0.07 | 0.33 |
| 3.61 | to | 3.70 | | 0.270 | | 0.08 | 0.35 |
| 3.71 | to | 3.80 | | 0.280 | | 0.08 | 0.36 |
| 3.81 | to | 3.90 | | 0.290 | | 0.09 | 0.38 |
| 3.91 | to | 4.00 | | 0.300 | | 0.09 | 0.39 |
| 4.01 | to | 4.10 | | 0.31 | | 0.10 | 0.41 |
| 4.11 | to | 4.20 | | 0.32 | | 0.11 | 0.43 |
| 4.21 | to | 4.30 | | 0.33 | | 0.11 | 0.44 |
| 4.31 | to | 4.40 | | 0.34 | | 0.12 | 0.46 |
| 4.41 | to | 4.50 | | 0.35 | | 0.12 | 0.47 |
| 4.51 | to | 4.60 | | 0.36 | | 0.12 | 0.48 |
| 4.61 | to | 4.70 | | 0.37 | | 0.12 | 0.49 |
| 4.71 | to | 4.80 | | 0.38 | | 0.12 | 0.50 |
| 4.81 | to | 4.90 | | 0.39 | | 0.12 | 0.51 |
| 4.91 | to | 5.00 | | 0.40 | | 0.12 | 0.52 |



## AMENDMENT TO APPENDIX A TO THE INTERMODAL INDEPENDENT CONTRACTOR OPERATING AGREEMENT

This amendment to Appendix A to the Intermodal Independent Contractor Operating Agreement ("Amendment"), entered into between the undersigned independent contractor ("Contractor") and J.B. Hunt Transport, Inc. ("Carrier"), is effective as of the 7th day of May 2023, by and between Contractor and Carrier.

**RECITALS**
The parties entered into Appendix A to the Intermodal Independent Contractor Operating Agreement, as amended, (the "Appendix"). The parties desire to modify the Appendix, upon the terms and conditions set forth herein.

**AGREEMENT**
In consideration of the foregoing, the mutual covenants herein contained and other good and valuable consideration (the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties hereto by their execution hereof), the parties agree to amend the Appendix as follows:

1. The gross settlement and deductions table in Section 1 is hereby deleted and replaced in its entirety with the following:

| Invoice Settlement Items | Rate/Amount |
|---|---|
| Chassis Flip | $35 per hour |
| Contractor Orientation | $75 per day |
| Cross-town Linehaul – Loaded (Per Load) Zone 1 | $35 |
| Cross-town Linehaul – Loaded (Per Load) Zone 2 | $45 |
| Cross-town Linehaul – Loaded (Per Load) Zone 3 | $60 |
| Cross-town Linehaul – Loaded (Per Load) Zone 4 | $90 |
| Customer Refused Load | $68 |
| Detention | *See* Section 1(d) of this Appendix A |
| Driver Assist | $25 per occurrence |
| Dunnage | $25 per occurrence |
| Empty Search | $32 per occurrence |
| Empty Trailer Repositioning | $32 per occurrence |
| Fuel Surcharge | *See* Surcharge Schedule attached as Appendix A-1 |
| Hazmat Load | $40 |
| Layover (Each 24 Hours excluding Weekends) | N/A |
| Linehaul-Loaded (Per Mile) | $1.15; See Section 1(a) of this Appendix A |
| Linehaul-Empty (Per Mile) | $1.15; See Section 1(a) of this Appendix A |
| Live Lift | $35 per occurrence |

| Mechanical Breakdown | $35 per hour |
|---|---|
| Milwaukee Market Surcharge | $75 per occurrence |
| Operational Meetings | $35 per hour |
| Overweight Rework Load | $35 per hour |
| Pick-up / Delivery (Drop/Hook) | $68 |
| Pick-up / Delivery (Live) | $90 |
| Rail Delay | $35; *See* Section 1(e) of this Appendix A |
| Refrigerated Load | $32 |
| Optional Incentives | *See* Appendix F |
| Safety Training | $35 per hour |
| Spot J.B. Hunt Equipment | $10 per occurrence |
| Truck Ordered Not Used (TONU) | $30 per occurrence |

This Amendment may be executed in counterparts, each of which will be deemed an original, and each of which will be taken together and constitute one and the same agreement. This Amendment may be executed by facsimile, and the delivery of signed copies of this Amendment by facsimile or electronically will constitute and be deemed to be delivery of the original signatures of the parties.

Except as expressly set forth herein, all other terms of the Agreement and Appendix remain in full force and effect.

**IN WITNESS WHEREOF**, a duly authorized officer of each party has signed this Amendment, and such is executed as of the date first set forth above.

**Contractor**

By: _____

Name: **JOHN LICITRA**

Title: Mr

**J.B. Hunt Transport, Inc.**

By: _____

Name:  William Dietrich

Title:  __Sr Vice President, Operations____